Eva M. Weiler (SBN: 233942)
eweiler@shb.com
Lael A. Awong (SBN: 246423)
lawong@shb.com
SHOOK, HARDY & BACON, L.L.P.
Jamboree Center
5 Park Plaza, Suite 1600
Irvine, California  92614-2546
Tel:  (949) 475-1500
Fax: (949) 475-0016

Paul R. Kiesel (SBN: 119854)
kiesel@kiesel-law.com
Helen Zukin (SBN:117933)
zukin@kiesel-law.com
KIESEL LAW LLP
8648 Wilshire Blvd.
Beverly Hills, CA  90211
Tel: 310-854-4444
Fax: 310-854-0812

Attorneys for Plaintiffs

[Other Counsel Listed Below]

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEANNE SANCHEZ, et al.,<br><br>    Plaintiff,<br><br>  v.<br><br>BOSTON SCIENTIFIC CORPORATION,<br><br>    Defendants. | Case No.  CV 15-1245-JFW (JEMx)<br><br>**SECOND AMENDED NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF KERRI WILTCHIK, M.D.**<br><br>**Trial: May 5, 2015** |

Pursuant to the Court's Civil Trial Order of April 17, 2015 (Doc. 220), Defendant Boston Scientific Corporation ("Boston Scientific") and Plaintiffs Rosanne and Rod Sanchez ("Plaintiffs") submit the following second amended notice of designated deposition testimony of Kerri Wiltchik, M.D.

## **PLAINTIFFS' POSITION ON BSC'S NEW OBJECTION**

After this Court addressed objections to Dr. Wiltchik's testimony, BSC decided to raise a new objection against previously un-objected testimony. In the parties' notice and amended notice for Dr. Wiltchik, Plaintiffs designated 124:22-125:2 as a counter designation. This testimony establishes that Dr. Wiltchik no longer uses mesh because her clinical experience revealed to her that mesh is dangerous. Once this Court excluded Plaintiffs' testimony on the MSDS that proved causation, Plaintiffs moved this counter-designation to their affirmative designation. Realizing the testimony proves causation, BSC decided to lodge a new objection. BSC argues that Dr. Wiltchik's decision to no longer use mesh is based on the FDA's finding that mesh for pelvic organ prolapse is dangerous. However, Dr. Wiltchik's testimony shows the decision was "based on [her] clinical practice":

122

3  Q.   When assessing treatment options for your

4  patients you considered the potential risks and benefits

5  associated with those treatment options, right?

6     A.   Correct.

7     Q.   Am I correct that you get, much like you

8  described before, that the information about treatment

9  options for your patients with SUI and POP, the

10  information you look to to identify those options, does

11  that information also pertain to the risks and benefits

12  of those treatment options?

13        MR. MORELAND:  Form.

14        THE WITNESS:  Yes.

15  BY MS. WEILER:

16     Q.   And so am I correct that you looked to

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

17   medical literature to help you understand the risks and

18   benefits associated with treatment options for POP?

19      A.   Correct.

20      Q.   And that you also look to medical

21   literature to identify the risks and benefits associated

22   with the treatment options available for SUI?

23      A.   Correct.

24      Q.   Do you as part of your practice, do you

25   keep up with medical literature about SUI and POP?

123

1      A.   I think so, yes.

2      Q.   And do you often do that through ACOG it

3   sounds like?

4      A.   Through ACOG.

5      Q.   And do you read medical literature on a

6   regular basis?

7      A.   Regular basis.

8      Q.   Has that always been the case in your

9   practice?

10      A.   Yeah, it's important to stay current.

11      Q.   Now, you continue to use mesh slings as

12   part of your treatment options available to patients

13   today; is that right?

14      A.   Biologic mesh.

15      Q.   And do you offer -- do you still use

16   synthetic slings for your patients today?

17      A.    For stress incontinence, yes.

18      Q.    Yes.  And so based on your clinical

19   experience do you believe that mesh slings are an

20   effective option for women as a treatment of SUI?

21            MR. MORELAND:  Form.

22            THE WITNESS:  Yes.

23   BY MS. WEILER:

24      Q.    And do you also believe that synthetic

25   slings for the treatment of SUI are a safe option for

                                      124

1   women for the treatment of SUI?

2             MR. MORELAND:  Form.

3             THE WITNESS:  Yes.

4   BY MS. WEILER:

5       Q.    Based on your clinical experience, do you

6   believe that mesh with the treatment of POP can be an

7   effective option for the treatment of POP in some

8   women?

9             MR. MORELAND:  Form.

10            THE WITNESS:  Yes.

11   BY MS. WEILER:

12      Q.    And based on your clinical practice do you

13   believe that mesh for the treatment of POP can be a safe

14   option for some women?

15            MR. MORELAND:  I'm sorry to interrupt.

16   Synthetic mesh?

SECOND AMENDED NOTICE OF
                                 DESIGNATED DEPOSITION TESTIMONY OF
                                 KERRI WILTCHIK, M.D.

17          MS. WEILER:  Yes.

18          MR. MORELAND:  Form.

19          THE WITNESS:  Synthetic mesh is safe right

20   now is what you're saying?

21   BY MS. WEILER:

22      **Q.    No, my question is based on your clinical**

**23   practice.  Do you believe synthetic mesh for the**

**24   treatment of pelvic organ prolapse can be a safe option**

**25   for some women?**

125

1          MR. MORELAND:  Form.

2          **THE WITNESS:  Not anymore.**

The bolded testimony, unobjected to in Plaintiffs' counter designation, is what BSC now newly objects to because it is "testimony pertaining to the FDA". The Court should overrule BSC's new objection.

**BOSTON SCIENTIFIC'S POSITION ON PLAINTIFFS' FDA DESIGNATION**

This Court ruled on April 30, 2015, that testimony pertaining to the FDA within the deposition of Dr. Wiltchik was to be excluded based on plaintiffs' objection.  The parties disagree as to whether a section of plaintiffs' designated testimony from the deposition of Dr. Wiltchik should also be struck pursuant to that order.

Plaintiffs seek to keep the following testimony included within their designation:

124:22-25, 125:2 [Plaintiffs]

124

22   Q.   No, my question is based on your clinical
23   practice.  Do you believe synthetic mesh for the
24   treatment of pelvic organ prolapse can be a safe option
25   for some women?

125

2   THE WITNESS:  Not anymore.

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

Boston Scientific objects as this testimony is FDA testimony and should be excluded, along with all the other FDA testimony, pursuant to this Court's order on FDA evidence.  The reason this testimony is FDA testimony is because Dr. Wiltchik unequivocally testified that she no longer uses synthetic mesh to treat pelvic organ prolapse because of the FDA's 2011 Public Health Notice, which has been excluded from admissibility in this action.  She states earlier in her deposition:

29

11    Q.   Okay.  And this was an FDA safety
12  communication.  Can you read the date issued?
13    A.   July 13, 2011.
14    Q.   Okay.  If you will look down about
15  three-quarters of the way under Purpose.
16    A.   Uh-huh.
17    Q.   And there's a paragraph that starts with
18  "The FDA is issuing this update."  Do you see that?
19    A.   Yes.
20    Q.   Can you please read the first sentence?
21    A.   "The FDA is issuing this update to inform
22  you that serious complications associated with surgical
23  mesh for transvaginal repair of POP are not rare."
24    Q.   Okay.  And then what does the next sentence
25  say?

30

1    A.   "This is a change from what the FDA
2  previously reported on October 20, 2008."
3    Q.   Okay.  So here, and tell me if I'm giving a
4  fair rendition of this, the '08 one said that the
5  complications were rare and here they're saying, and
6  it's even in bold, that they're not rare, true?
8      THE WITNESS:  Correct.
10    Q.   Okay.  Now, I want to go back to your
11  general practice.  What, if any, role did this have in
12  changing your practice with respect to pelvic organ
13  repair?
15      **THE WITNESS:  In 2011 when this FDA warning**
16  **came out we stopped using mesh -- we stopped using,**

6                          SECOND AMENDED NOTICE OF
                    DESIGNATED DEPOSITION TESTIMONY OF
                                KERRI WILTCHIK, M.D.

**17   excuse me, synthetic mesh.**
**19        Q.    Now, is that specific to pelvic organ**
**20   prolapse?**
**21        A.    Yes.**
22        Q.    Okay.  So from then or shortly thereafter
23   neither yourself nor your partners utilized any of the
24   pelvic organ prolapse repair kits; is that fair?
25        A.    Correct.

While plaintiffs argue that Dr. Wiltchik's testimony at pages 124 and 125 was based on her clinical practice, this is rebutted by the question immediately following plaintiff's proposed designation, whose answer links it directly back to the testimony on the FDA 2011 PHN:

124:22-25, 125: 2 [Plaintiffs]

                              124
22        Q.    No, my question is based on your clinical
23   practice.  Do you believe synthetic mesh for the
24   treatment of pelvic organ prolapse can be a safe option
25   for some women
                              125
2    THE WITNESS:  Not anymore.
…
**4        Q.    And that's since 2011?**
**5        A.    Since the FDA came out, yeah.**

Dr. Wiltchik's decision to stop using synthetic mesh to treat pelvic organ prolapse was not based on her clinical experience.  It was based on the FDA's 2011 Public Health Notice.  Accordingly, Plaintiff's proposed proffer is inextricably intertwined with FDA evidence and should be excluded.

In the alternative, should the Court find this statement admissible despite its FDA order, Boston Scientific should be allowed to explain Dr. Wiltchik's reasoning, including the FDA's public health notice and the FDA's oversight role with respect to

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

medical devices. [1]   Without this context, Boston Scientific would be severely and unfairly prejudiced.  The jury would be allowed to improperly and unfairly speculate regarding Dr. Wiltchik's reasons for no longer using synthetic mesh.  The jury might speculate that Dr. Wiltchik believes mesh is not appropriate because of literature she has read, complications she has observed, or, more prejudicially, because of Ms. Sanchez's outcome.  Plaintiffs' argument that their proposed "testimony proves causation" further illustrates the unfair prejudice to Boston Scientific as the fact that Dr. Wiltchik's decision was based on a regulatory document operates to rebut causation.

The Court has made clear that FDA testimony is inadmissible and this designation should be excluded.

### **Exhibits in Designated Deposition Testimony**

Pursuant to the Court's order at the hearing on April 30, 2015, the parties submit that the following exhibits are included in the designated deposition testimony of Kerri Wiltchik, M.D.:

| Trial Ex No. | Description | Deposition Exhibit No. | Objection | Court Ruling |
|---|---|---|---|---|
| PLT 125 | **Pinnacle Pelvic Floor Repair Kits Anterior/Apical and Posterior DFU- Rev B** this document is the Directions for Use that were included with a Pinnacle    Anterior/Apical    and | 3 | | Admitted |

---

[1]   Plaintiffs argue that Boston Scientific is asserting a "new objection against previously un-objected testimony;" however, that is incorrect.  Boston Scientific is pointing out that the testimony is, at its core, FDA testimony and should be included within the order granting plaintiffs' request to exclude FDA evidence.  If this testimony is admitted, it should likewise open the door to FDA evidence that is essential to put this testimony in the proper context.  At the time Plaintiffs' designated this testimony (as a counter designation to Boston Scientific's affirmative designations) FDA contextual evidence was included in Boston Scientific's designations and otherwise objected to by Plaintiff. Boston Scientific did not object to this testimony as it believes FDA evidence *in its entirety* should be admissible.  Plaintiffs should not be permitted to admit only the FDA testimony helpful to their case.

SECOND AMENDED NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF KERRI WILTCHIK, M.D.

| | | | | | |
|---|---|---|---|---|---|
| | | Pinnacle Posterior PFR Kit from 2009. This document contains a statement acknowledging that no randomized controlled trials were conducted prior to the release of the Pinnacle PFR Kit. | | | |
| | DX 15 | Agreed Upon Set of Medical Records | 1, 11 | | Admitted |
| | DX 7 | Advantage Fit Directions for Use Revision B dated 2009. | 3 | | Admitted |
| | DX 55 | AUGS Position Statement on Restriction of Surgical Options for Pelvic Floor Disorders | 13 | | Admitted |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

**Testimony Designated by Plaintiffs**

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 5:7-15 [PLAINTIFFS]<br>7    Q.   Good morning, Doctor.  How are you?<br>8    A.   Doing well.<br>9    Q.   Could you state your full name for the<br>10  record, please.<br>11   A.   Kerri Sue Wiltchik.<br>12   Q.   Okay.  And can you tell us just generally<br>13  what it is that you do professionally?<br>14   A.   I am a general gynecologist.  I'm board<br>15  certified in OB-GYN.  In 2003 I stopped doing<br><br>5:16-25 [BOSTON SCIENTIFIC -  COMPLETENESS DESIGNATION]<br>*16  deliveries, I stopped doing OB due to malpractice*<br>*17  insurance rates, so ever since that time I just practice*<br>*18  gynecology.*<br>*19 Q. Just to give a little bit of*<br>*20  background, my name's Mike Moreland, I represent Mr. and*<br>*21  Mrs. Sanchez in a lawsuit against Boston Scientific.  Do*<br>*22  you understand that?*<br>*23   A.   Understood.*<br>*24   Q.   We have met before, correct?*<br>*25   A.   Correct.*<br><br>9:13-23 [PLAINTIFFS]<br>13   Q.   Talk to me a little bit about your general<br>14  practice, and why don't we just start with your<br>15  education.<br>16   A.   So I went to Kenyon College in Ohio for<br>17  undergraduate after high school.  I then went on to<br>18  Chicago Medical School.  After that I went and I did one<br>19  year of internship in internal medicine at L.A. County<br>20  USC, then went and did a preliminary year of OB-GYN at<br>21  L.A. County - USC, then I finished my residency in<br>22  Lehigh Valley, Pennsylvania, and then from there I moved<br>23  here and started my job. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 10:12-16 [PLAINTIFFS]<br>12      Q.    Okay.  We're here to talk specifically<br>13   about Ms. Sanchez, your treatment of Ms. Sanchez, but<br>14   also generally about Boston Scientific pelvic products.<br>15   Do you understand?<br>16      A.    Yes.<br><br>12:6-24 [PLAINTIFFS]<br>6      Q.    What is stress urinary incontinence?<br>7      A.    Stress urinary incontinence is when a woman<br>8   loses urine when she coughs, sneezes, laughs, certain<br>9   things, and it's really a pelvic floor muscle, I'm not<br>10   sure what it's called, weakened.<br>11      Q.    Okay.  Is stress urinary incontinence a<br>12   life-threatening condition?<br>13      A.    No.<br>14      Q.    What about with respect to pelvic organ<br>15   prolapse, just generally speaking can you kind of give<br>16   me the same information?<br>17      A.    Same thing, so women have pelvic organ<br>18   prolapse, they can have their bowel, their bladder,<br>19   their uterus, things can be moving south essentially.<br>20   And that has to do with life changes, it has to do with<br>21   pregnancies, many different factors, genetics.  And it's<br>22   not necessarily life threatening, but it's very<br>23   uncomfortable and can interfere with your activities,<br>24   many times more than even stress incontinence.<br><br>12:25-13:3 [BOSTON SCIENTIFIC COMPLETENESS<br>DESIGNATION]<br>25      *Q.    Now, up until the time in January of 2010*<br>                                                    *13*<br>*1   when you implanted Ms. Sanchez, can you kind of give me*<br>*2   the same information about the pelvic floor repair kits*<br>*3   that you used?*<br><br>13:5-22 [BOSTON SCIENTIFIC COMPLETENESS<br>DESIGNATION]<br>*5      THE WITNESS:  So up until that time?*<br>*6   BY MR. MORELAND:*<br>*7      Q.    Yes, ma'am.*<br>*8      A.    So when we first started using mesh we used*<br>*9   different types of mesh, and we were just putting it in,*<br>*10   we didn't use a kit.  We would use the Capio device and*<br>*11   do the entire procedure ourselves.  We didn't*<br>*12   particularly care for the kits.  Then the Boston* | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 13  *Scientific people came to us and showed us that the*<br>14  *exact same thing we were doing using the Capio and*<br>15  *suturing in the different mesh products was essentially*<br>16  *the same as what their product was doing.  So their*<br>17  *product then would -- the Pinnacle Prolene mesh kit*<br>18  *would really improve the time and how, I guess quick,*<br>19  *you don't want to say it's only for quick, it's just the*<br>20  *procedure itself would be simplified, but it was*<br>21  *essentially the same procedure we were performing, so we*<br>22  *decided to try it and went from there.*<br><br>13:23-14:2 [PLAINTIFFS]<br>23     Q.    Okay.  And if you recall in January 13th of<br>24  2010 do you recall what products were implanted in<br>25  Ms. Sanchez?<br>                                                         14<br>1      A.    The Pinnacle Prolene mesh kit as well as<br>2  the Advantage Fit tape.<br><br>7:1-7:20 [PLAINTIFFS]<br>1      Q.    You in the regular course of your treatment<br>2  just in general have occasion to prescribe drugs,<br>3  true?<br>4      A.    Correct.<br>5      Q.    And you also have occasion to provide -- to<br>6  prescribe devices, correct?<br>7      A.    Correct.<br>8      Q.    Okay.  In the course of making a decision<br>9  about whether or not to prescribe a drug or a device do<br>10  you do a risk/benefit analysis?<br>11     A.    Yeah.<br>12     Q.    What does that entail?<br>13     A.    So I hesitated because of -- essentially<br>14  you get the information that you can find, whether it's<br>15  from the company and the representative that they hand<br>16  you different articles, and you then look -- we practice<br>17  in our office by ACOG standards, which is American<br>18  College of OB-GYN, so many times ACOG has some general<br>19  guidelines of what you should do and what you ought not<br>20  to do.<br><br><br>7:23-8:7 [PLAINTIFFS]<br>23          Is it a fair statement to say that | | |

12

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 24   virtually any drug or device is going to have some<br>25   adverse risk to it?<br>                          8<br>1      A.   Absolutely.<br>2      Q.   Okay.  And you obviously as a physician<br>3   hope that the -- or wouldn't use the device or drug if<br>4   you didn't think the benefit outweighed that risk, true?<br>5      A.   Correct.<br>6      Q.   Okay.  Is it important to you that you're<br>7   made aware of all the risks?<br><br>8:11-14 [PLAINTIFFS]<br>11      A.   Absolutely.<br>12      Q.   Okay.  And generally speaking, you know,<br>13   you have the risk itself.  Is it also important to you<br>14   to know the frequency of that risk?<br><br>8:17 [PLAINTIFFS]<br>17           THE WITNESS:  Yes.<br><br>8:19-20 [PLAINTIFFS]<br>19      Q.   Okay.  Is it also important to you to know<br>20   the severity of that risk?<br>8:22 [PLAINTIFFS]<br>22           THE WITNESS:  Yes.<br>8:24-9:1 [PLAINTIFFS]<br>24      Q.   And do you expect that the manufacturer of<br>25   a drug or device would give you complete and accurate<br>                          9<br>1   information about their product?<br>9:4<br>4           THE WITNESS:  Yes.<br>9:6-8 [PLAINTIFFS]<br>6      Q.   Do you expect that that manufacturer would<br>7   be truthful and give you full disclosure about the risk<br>8   as well as the benefit?<br>9:11 [PLAINTIFFS]<br>11           THE WITNESS:  Yes.<br><br>14:3-8 [PLAINTIFFS]<br>3      Q.   Okay.  I want to talk -- I want to go on<br>4   now and talk specifically about your treatment of<br>5   Ms. Sanchez.  And I think we just discussed that the<br>6   original implantation was in January of 2010; is that<br>7   right?<br>8      A.   Correct. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 14:21-23 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 21      Q.   Okay.  If you could turn to the operative | | |
| 22   record from January 13, 2010.  Do you have that? | | |
| 23      A.   Yes. | | |
| | | |
| 15:3-13 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 3      Q.   Okay.  Can you tell me what is the | | |
| 4   preoperative diagnosis on this report? | | |
| 5      A.   Symptomatic uterovaginal prolapse and | | |
| 6   midline cystocele. | | |
| 7      Q.   And then the surgery that was actually | | |
| 8   performed, what was that? | | |
| 9      A.   A vaginal hysterectomy, bilateral | | |
| 10   sacrospinous ligament vaginal vault suspension, anterior | | |
| 11   and posterior repairs with a Pinnacle Prolene mesh kit, | | |
| 12   pubovaginal sling with Advantage Fit tape and diagnostic | | |
| 13   cystoscopy. | | |
| | | |
| 16:19-23 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 19      Q.   If you look at the -- first of all, this | | |
| 20   was a procedure done under general anesthesia, | | |
| 21   correct? | | |
| 22      A.   Correct. | | |
| 23      Q.   Okay.  And can you tell looking here what | | |
| | | |
| 17:5-8 [PLAINTIFFS] | | |
| 5      Q.   Okay.  And looking through this does it | | |
| 6   appear to you that there were any complications during | | |
| 7   the procedure? | | |
| 8      A.   No. | | |
| | | |
| 18:12-19:13 [PLAINTIFFS] | | |
| 12      Q.   Okay.  And so let me ask you this: | | |
| 13   Separate and apart from this, would you have a | | |
| 14   discussion with Ms. Sanchez or did you have a | | |
| 15   discussion with Ms. Sanchez about the procedure? | | |
| 16      A.   Yes. | | |
| 17      Q.   And just can you tell us what that | | |
| 18   conversation or discussion was? | | |
| 19      A.   For every pre-op case I always talk to | | |
| 20   patients about the risks, the benefits of the procedure, | | |
| 21   things that they can expect.  We talk about bleeding, we | | |
| 22   talk about infection.  We talk about injury to the | | |
| 23   neighboring organs, bowel, bladder, and just the | | |
| 24   understanding that surgery is never perfect and that, | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 25   you know, you're never going to be 20 again, just the<br>                                 19<br>1   best you can do.<br>2        Q.   As much as we'd like to be?<br>3        A.   Yeah.<br>4        Q.   Did you have a discussion with Ms. Sanchez<br>5   specific to the mesh products that were being placed?<br>6        A.   Yes.  So in a patient where I would be<br>7   placing mesh I always tell them there are risks with the<br>8   mesh, risk of erosion, risk of pain.  But again, I would<br>9   probably have told her, I can't specifically -- that<br>10  I've used this product many times and I didn't foresee<br>11  any issues.<br>12       Q.   Was it your understanding at that time that<br>13  those types of complications were rare?<br><br>19:16-18 [PLAINTIFFS]<br>16             THE WITNESS:  Anecdotally to my practice<br>17  they were rare, and my understanding it was not a big<br>18  problem in the literature.<br>19:20-22 [PLAINTIFFS]<br>20       Q.   Okay.  And were you ever given any<br>21  information about whether or not it was rare by Boston<br>22  Scientific sales representatives?<br><br>19:25-20:2 [PLAINTIFFS]<br>25             THE WITNESS:  I can't say if they<br>20<br>1   specifically gave me something about erosion, but just<br>2   in general told us that the complications were rare.<br><br><br>21:13-22:5 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>13       Q.   Okay.  And this is a Pinnacle pelvic repair<br>14  kits direction for use, correct?<br>15       A.   Correct.<br>16       Q.   You've seen this before, correct?<br>17       A.   I'm assuming so, yes.  Correct.  Years<br>18  ago.<br>19       Q.   If you look, and I guess let me just ask<br>20  you this:  I assume that in addition to the directions<br>21  for use that you would have looked at other information<br>22  also in doing your risk/benefit analysis, fair?<br>23       A.   Fair.  Yes.<br>24       Q.   Other than directions for use, what else<br>25  would you have looked at? |  |  |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

22

1     A.    So usually the drug reps or the device reps
2  would bring different articles and literature about the
3  studies performed using the specific device so that you
4  could get a better risk analysis, and discussed it with
5  them.

22:10-24 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]
10     Q.    Sure.  If you'll turn with me to Page 4,
11  and if you look at the top left in bold.  What does
12  that say?
13     A.    Warnings/potential complications.
14     Q.    And then if you look on the right side
15  about halfway down there's another bolded category, what
16  is that?
17     A.    Adverse events.
18     Q.    In your clinical practice do those phrases
19  have different meanings to you?
20     A.    Yes.
21     Q.    What are they?
22     A.    A warning of potential complication is
23  something very serious, and adverse event is just
24  something to be aware of.

23:8-20 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]
8     Q.    If you look down 5th from the bottom under
9  the warnings/potential complications section, and that
10  section indicates that "Known risks of surgical
11  procedures for the treatment of prolapse include pain,
12  infection, erosion/exposure, device migration, complete
13  failure of the procedure resulting in recurrent or
14  de Novo prolapse and/or incontinence."  Did I read that
15  right?
16     A.    Correct.
17     Q.    Anywhere in that section do you see any
18  information given to you about the occurrence rates of
19  those types of known complications, potential
20  complications?

23:23 [PLAINTIFFS]
23         THE WITNESS:  No.

23:25 - 24:1 [PLAINTIFFS]
25     Q.    Is that the type of information that you

24

1  would have wanted to know?

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 24:4 [PLAINTIFFS]<br>4       THE WITNESS:  Yes.<br><br>24:6-8 [PLAINTIFFS]<br>6     Q.   Okay.  And is that the type of information<br>7  that you would expect that as a manufacturer of this<br>8  device that you would get?<br><br>24:11 [PLAINTIFFS]<br>11      THE WITNESS:  Yes.<br><br>24:13-14 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>13     Q.   Okay.  Anywhere in that section does it<br>14  speak to the severity of those conditions?<br><br>24:17 [PLAINTIFFS]<br>17      THE WITNESS:  No.<br><br>24:19-21 [PLAINTIFFS]<br>19     Q.   Is that the type of information that would<br>20  be important to you in making your risk/benefit<br>21  analysis?<br><br>24:23 [PLAINTIFFS]<br>23      THE WITNESS:  Yes.<br><br>24:25 - 25:5 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>25     Q.   Okay.  If you go to the adverse event<br>25<br>1  section, do you see there where it lists dyspareunia?<br>2     A.   Yes.<br>3     Q.   Take a moment, I want you to go back and<br>4  look at the warnings/potential complications and let me<br>5  know if you see that anywhere in there.<br><br><br>25:8 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>8      THE WITNESS:  Not specifically.<br><br>25:10-17 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>10     Q.   Okay.  And I want to go back to -- so the<br>11  only place that you see that listed is under adverse<br>12  events, correct?<br>13     A.   Correct.<br>14     Q.   And you testified earlier that that would<br>15  mean something different to you having that placed | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| under<br>16   adverse events than it would under the prior category?<br>17           THE WITNESS:  Correct.<br><br>25:21-24 [PLAINTIFFS]<br>21       Q.    If dyspareunia had been listed in that<br>22   prior section, would that have changed the way that you<br>23   would have consented, or the discussion that you would<br>24   have had with Ms. Sanchez?<br><br>26:2 [PLAINTIFFS]<br>2           THE WITNESS:  Yes.<br><br>26:4-6 [PLAINTIFFS]<br>4       Q.    And meaning that you would have placed more<br>5   emphasis and you would have disclosed that to her,<br>6   correct?<br><br>26:8 [PLAINTIFFS]<br>8           THE WITNESS:  Correct.<br><br>26:10-15 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>10       Q.    If you go back to the section we looked at<br>11   one, two, three, four, the fifth one from the bottom on<br>12   the warning section, it talks about pain?<br>13       A.    Uh-huh.<br>14       Q.    What was your understanding of the type of<br>15   pain that was referencing?<br><br>26:18-19 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>18           THE WITNESS:  Pain of the insertion of the<br>19   device, not necessarily long-term pain.<br><br>26:21-27:1 [PLAINTIFFS]<br>21       Q.    Okay.  So there is going to be some pain<br>22   associated with the procedure itself?<br>23       A.    Correct.<br>24       Q.    And you did not understand that to tell you<br>25   that there would be potentially pain months, years down<br>                                                        27<br>1   the road, fair?<br><br>27:4 [PLAINTIFFS] [Referencing Pltfs. Ex. 125]<br>4           THE WITNESS:  Fair.<br><br>27:6-8 [PLAINTIFFS]<br>6       Q.    And is that the type of information that | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 7   you would have wanted to know in making your<br>8   risk/benefit analysis with Ms. Sanchez?<br><br>27:10 [PLAINTIFFS]<br>10          THE WITNESS:  Yes.<br><br>27:12-14 [PLAINTIFFS]<br>12      Q.   And if you had had that information is that<br>13   the type of information you would have conveyed to<br>14   Ms. Sanchez?<br><br>27:17 [PLAINTIFFS]<br>17          THE WITNESS:  Yes. | | |
| 124:22-25 [PLAINTIFFS]<br>22      Q.   No, my question is based on your clinical<br>23   practice.  Do you believe synthetic mesh for the<br>24   treatment of pelvic organ prolapse can be a safe option<br>25   for some women?<br><br>125:2 [PLAINTIFFS]<br>2          THE WITNESS:  Not anymore. | 124:22-125:2<br>[BSC]<br>This testimony is<br>precluded by the<br>Court's previous<br>ruling excluding<br>FDA testimony<br>pursuant to<br>Plaintiffs' FDA<br>objection. | 124:22-125:2<br>[PLAINTIFFS]<br>New Objection<br>Response |
| 19      Q.   I want to go back and talk to you a little<br>20   bit about more specifically the medical records<br>21   regarding your treatment of Ms. Sanchez.  Okay?  Kind of<br>22   shifting gears here.<br>23      A.   Okay.<br>181:2-12  [PLAINTIFFS] [Referencing Def. Ex. 15]<br>2      Q.   And Ms. Sanchez' first postoperative visit<br>3   was on the 26th of January, right?<br>4      A.   Uh-huh.<br>5      Q.   And it looks like in her HPI at the top<br>6   that she was having discharge; is that right?<br>7      A.   What page?<br>8      Q.   Sorry.  52 of Exhibit 11.<br>9      A.   Correct.<br>10      Q.   Is vaginal discharge something that often<br>11   occurs postsurgery?<br>12      A.   Very common. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 181:14-16 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>14  BY MS. WEILER:<br>15      Q.    And it often occurs after this type of<br>16   surgery?<br><br>181:18 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>18            THE WITNESS:  Very common.<br><br>181:20-21 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>20      Q.    So that wasn't an unusual finding, in your<br>21   mind?<br><br>181:23-182:2 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>23            THE WITNESS:  At that time, no.<br>24   BY MS. WEILER:<br>25      Q.    And it says, "Patient otherwise feels well,<br>                                                         182<br>1   and the pain is improving."<br>2      A.    Correct.<br><br>182:8-17 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>8      Q.    So you saw her next in mid-February.  Was<br>9    that a regularly scheduled appointment or did she come<br>10   in before the standard follow-up date?<br>11      A.    What page are you on?<br>12      Q.    Now I'm on 50.<br>13      A.    Sorry.  It looks like that was an extra<br>14   visit.<br>15      Q.    Okay.  Do you know why she came in that<br>16   day?<br>17      A.    It says because she was having discharge.<br><br>182:24-183:24 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>24      Q.    Down below under Treatment it says,<br>25   "Post-op."  It says, "Patient discharge is worse due to<br>                                                         183<br>1   the stitches dissolving."<br>2      A.    Correct.<br>3      Q.    "But it is also attributed to bacterial<br>4   vaginosis."  Did I read that correctly?<br>5      A.    Correct.<br>6      Q.    What did you mean by "stitches dissolving"?<br>7      A.    As the stitches dissolve, usually around<br>8   three to four weeks you get a discharge, it's kind of a<br>9   goopy brownish tan discharge.<br>10      Q.    Is that what you associated her discharge | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 11   with at that time? | | |
| 12      A.    That's what I thought.  It's not alarming | | |
| 13   at that point in your postoperative healing. | | |
| 14      Q.    And then I guess you next saw her on the | | |
| 15   23rd of February, I'm looking at Page 48 now. | | |
| 16      A.    Correct. | | |
| 17      Q.    Is that the standard follow up? | | |
| 18      A.    That's the standard follow up, that's six | | |
| 19   weeks. | | |
| 20      Q.    So at that time she says she's feeling | | |
| 21   well? | | |
| 22      A.    Uh-huh. | | |
| | | |
| 183:25-184:2 [BOSTON SCIENTIFIC COMPLETENESS DESIGNATION] | | |
| 25      *Q.    Did you give her clearance to resume all* | | |
| *184* | | |
| *1   activity at that time?* | | |
| *2      A.    I did.* | | |
| | | |
| 184:3-5 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 3      Q.    The next record I see it for April 9th, | | |
| 4   2010, I'm on Page 46.  Do you see that? | | |
| 5      A.    Uh-huh. | | |
| | | |
| 184:19-21 [BOSTON SCIENTIFIC COMPLETENESS DESIGNATION] | | |
| 19      *Q.    Well, actually it says her husband does not* | | |
| 20   *feel in during intercourse; is that right?* | | |
| 21      *A.    Oh, I'm sorry.  At this time, yes.* | | |
| | | |
| 185:4-12 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 4      Q.    Okay.  I see down at the bottom under | | |
| 5   Treatment you said -- it's indicated "Patient will use | | |
| 6   Vagifem and stop intercourse and monitor her symptoms. | | |
| 7   She understands that a few treatments may be required | | |
| 8   before the exposed mesh areas are completely covered and | | |
| 9   her symptoms resolve."  Did I read that correctly? | | |
| 10      A.    Correct. | | |
| 11      Q.    Did you convey that to Ms. Sanchez? | | |
| 12      A.    Yes. | | |
| | | |
| 185:19-186:3 [PLAINTIFFS] [Referencing Def. Ex. 15] | | |
| 19      Q.    And what is the Vagifem? | | |
| 20      A.    Vagifem is a vaginal estrogen.  Vagifem | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 21  comes in a little tablet, so it's not as messy as<br>22  creams, and we tended to have samples at that time so it<br>23  was sort of nice, just give them some samples.<br>24     Q.   What was the intention behind the<br>25  prescribing that?<br>                  186<br>1    A.   The intention is to help the mucosa sort of<br>2  cover over the exposed area, just promote healing.  Very<br>3  atrophic vagina does not heal well.<br><br>49:8-9 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>8    Q.   Okay.  And if you look at your record dated<br>9  May 3rd, 2010.<br><br>49:17-50:7 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>17    Q.   Okay.  Can you tell me what the diagnosis<br>18  is on that date?<br>19    A.   Complications due to genitourinary device,<br>20  graft and implant.<br>21    Q.   What specifically is that referring to?<br>22    A.   The exposed mesh from the Pinnacle<br>23  product.<br>24    Q.   Okay.  And can you tell us what, if<br>25  anything, you did at that time to treat Ms. Sanchez?<br>50<br>1    A.   It looks like I excised the exposed mesh<br>2  that I could see, I applied silver nitrate, and then was<br>3  continuing the vaginal estrogen product.<br>4    Q.   Okay.  And to the extent that you recall<br>5  during the course of your treatment with her at that<br>6  time did she express any emotion about how she was<br>7  feeling as a result of these complications?<br><br>50:10-14 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>10        THE WITNESS:  Same thing, she was very<br>11  frustrated.  It was interfering with her sex life, it<br>12  was interfering with her then -- because of that with<br>13  the relationship with her husband.  It was just<br>14  frustrating.  She wanted it all to be back to normal.<br><br>50:16-17 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>16    Q.   Okay.  If you turn to your record dated<br>17  June 18th, 2010.<br><br>50:23-52:3 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>23    A.   Oh, that says, "Op report."  Yes, I have<br>24  that.  Yes. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 25      Q.    So that's an operative report?<br>51<br>1     A.    Correct.<br>2     Q.    Okay.  And what's the date?<br>3     A.    June 18th, 2010.<br>4     Q.    This was for Ms. Sanchez, correct?<br>5     A.    Correct.<br>6     Q.    Okay.  And can you tell us what your<br>7  preoperative diagnosis was?<br>8     A.    Exposed mesh status post pelvic<br>9  reconstruction with a Pinnacle propylene mesh kit.<br>10     Q.    Okay.  What was the actual operation that<br>11  you performed that day?<br>12     A.    Excision of exposed mesh.<br>13     Q.    What were your findings?<br>14     A.    A large portion of exposed mesh anteriorly<br>15  on the posterior aspect of the midline incision<br>16  approximately two centimeters in length.<br>17     Q.    Was this procedure performed under general<br>18  anesthesia?<br>19     A.    Yes.<br>20     Q.    Are there risks associated with having a<br>21  procedure under general anesthesia?<br>22     A.    Yes.<br>23     Q.    What are some of those?<br>24     A.    Well, the risk of the medication itself,<br>25  the risk of just being put to sleep essentially.<br>52<br>1     Q.    And this, again -- well, let me ask you.<br>2  From a medical standpoint why was, if it was, this<br>3  procedure medically necessary?<br><br>52:5-12 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>5          THE WITNESS:  So the mesh that we were<br>6  trying to treat in the office, it seemed to be<br>7  increasing in size and was -- she wanted definitive<br>8  treatment.  She was frustrated and just wanted it to be<br>9  over.  So the thought was if she was put under<br>10  anesthesia good exposure could be visually performed so<br>11  that the entire area of problem could be taken care<br>12  of.<br><br>52:14-17 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>14     Q.    Okay.  And did this procedure in fact<br>15  provide the relief that Ms. Sanchez was trying to<br>16  find? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 17    A.   No. | | |

52:20-22 [PLAINTIFFS] [Referencing Def. Ex. 15]
20    Q.   If you'll look at the operative report
21  dated October 12th, 2010.  Do you have that?
22    A.   Uh-huh, yes.

53:2-54:15 [PLAINTIFFS] [Referencing Def. Ex. 15]
2    Q.   Okay.  And have you seen this document
3  before?
4    A.   Yes.
5    Q.   What's the date of the document?
6    A.   October 12th, 2010.
7    Q.   Okay.  And what is the preoperative
8  diagnosis?
9    A.   Exposed vaginal mesh.
10    Q.   And what procedure was actually
11  performed?
12    A.   Excision of exposed mesh.
13    Q.   And was this, again, performed under a
14  general anesthesia?
15    A.   Yes.

186:21-22  [PLAINTIFFS] [Referencing Def. Ex. 15]
21    Q.   Did you have an assessment as to why that
22  was occurring?
186:24 [PLAINTIFFS] [Referencing Def. Ex. 15]
24       THE WITNESS:  Not why.

187:2-7 [BOSTON SCIENTIFIC COMPLETENESS
DESIGNATION]
*2    Q.   Just above that it says, "She had been*
*3  treated for months in the office with small amounts of*
*4  excision of exposed mesh."  When you say "small*
*5  amounts," how much were you were excising?*
*6    A.   I think not even a centimeter, we're*
*7  talking millimeters.*

188:9-189:8 [PLAINTIFFS] [Referencing Def. Ex. 15]
9    Q.   If you could look at -- I'm looking now
10  back at Exhibit 11, Page 27, it's progress notes for
11  11/15/2010.
12    A.   Uh-huh.
13    Q.   Exhibit 11, No. 27.  So the progress notes
14  for November 15th, 2010.
15    A.   Sure.
16    Q.   It looks like Ms. Sanchez presented for

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 17  complaints of abnormal vaginal bleeding? | | |
| 18    A.    Uh-huh. | | |
| 19    Q.    Is that right? | | |
| 20    A.    Correct. | | |
| 21    Q.    And then down below under Treatment it | | |
| 22  says, "Patient understands this bleeding may be the | | |
| 23  suture material dissolving."  Did I read that | | |
| 24  correctly? | | |
| 25    A.    Page 27. | | |

189

| | | |
|---|---|---|
| 1    Q.    Under post-op, last sentence. | | |
| 2    A.    Oh, yes.  Sorry. | | |
| 3    Q.    So did you tell that to Ms. Sanchez? | | |
| 4    A.    Yes, it's the same thing as we said on a | | |
| 5  previous, when she had original surgery, when the | | |
| 6  sutures start dissolving in three to four weeks out you | | |
| 7  can get a funky discharge.  So it's really hard to say | | |
| 8  is it an infection or is it the sutures dissolving. | | |

189:9-25 [BOSTON SCIENTIFIC COMPLETENESS DESIGNATION]

| | | |
|---|---|---|
| *9    Q.    Was it your impression that it could very* | | |
| *10  well just be -- the discharge she was having very well* | | |
| *11  could have been the sutures dissolving?* | | |
| *12    A.    It could have been.  I treated empirically* | | |
| *13  with a vaginal antibiotic which can also promote* | | |
| *14  healing, which is also not necessarily harmful, it* | | |
| *15  wasn't systemic.* | | |
| *16    Q.    It also says, "She was having some* | | |
| *17  abdominal pain and cramping on that date."  Did I read* | | |
| *18  that correctly?* | | |
| *19    A.    Yes.* | | |
| *20    Q.    Did you assess why that may have been* | | |
| *21  occurring?* | | |
| *22    A.    Specifically on this paper I can't say that* | | |
| *23  I did.  With her history of irritable bowel disease you* | | |
| *24  just never -- you never know.  It was mentioned, that's* | | |
| *25  all I can say.* | | |

53:16-54:14 [PLAINTIFFS] [Referencing Def. Ex. 15]

| | | |
|---|---|---|
| 16    Q.    Now, if you go through, and I'll try to be | | |
| 17  brief, but on April 11th of 2011 you had an office visit | | |
| 18  with Ms. Sanchez; is that correct? | | |
| 19    A.    Correct. | | |
| 20    Q.    And what was the purpose of her visit that | | |
| 21  day? | | |
| 22    A.    That she was having problems with bleeding, | | |

25

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 23  discharge, problems with her bladder.<br>24      Q.   Okay.  And again, there was exposed mesh;<br>25   is that correct?<br>                                                                  54<br>1      A.   Exposed mesh, yes.<br>2      Q.   What procedure did you perform?<br>3      A.   So I, again, excised the mesh in the<br>4  office, applied silver nitrate, and used vaginal<br>5  estrogen.<br>6      Q.   Okay.  Now, prior to this we've looked at<br>7  operative reports that show two procedures under general<br>8  anesthesia in order to excise mesh; is that right?<br>9      A.   Correct.<br>10     Q.   Okay.  And despite having performed those<br>11  two procedures under general anesthesia she was still<br>12  having -- she was still coming in with complaints about<br>13  exposed mesh; is that fair?<br>14     A.   Yes.<br><br>190:25-191:21 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>25     Q.   If you could also turn then to Page 19,<br>                                                                 191<br>1  this is May 11th, 2011 progress notes.<br>2      A.   Uh-huh.<br>3      Q.   Again, under the History of Present Illness<br>4  "Patient feels well since more mesh was excised."  Did I<br>5  read that correctly?<br>6      A.   Correct.<br>7      Q.   And "The discharge is almost gone and she<br>8  feels well."<br>9      A.   Correct.<br>10     Q.   Down below under Treatment it says,<br>11  "Discussed at length patient's reaction to mesh and<br>12  propensity for body to expel mesh."  Did I read that<br>13  correctly?<br>14     A.   Uh-huh.<br>15     Q.   What did you mean by that?<br>16     A.   Well, because she was asking how come this,<br>17  and I told her I don't have -- she's the only person in<br>18  my practice that I know of who went for two excisions of<br>19  mesh and had all of this, and I told her I have no idea<br>20  why this is happening and for some reason your body<br>21  doesn't like it, so that's what I meant.<br><br>55:19-56:6 [PLAINTIFFS] [Referencing Def. Ex. 15] |  |  |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 19    Q.    Okay.  Now, I have also, if you'll flip<br>20  through your chart on Exhibit 1, on July 8th of 2011<br>21  there was an additional in-office mesh trimming.  Does<br>22  that look right to you?<br>23      A.    July of 2008?<br>24    Q.    July 8th of 2011.<br>25      A.    Probably.  Sorry, I'll get there.  I was<br><div align="right">56</div>1  still in April.  Yes, I have it.<br>2      Q.    Okay.  And what was the history of present<br>3  illness there?<br>4      A.    44 year old with vaginal discharge blood<br>5  tinged without pain, her husband does notice some<br>6  exposed mesh areas on occasion.<br><br>56:18-25 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>18      Q.    Okay.  And if you -- in the interest of<br>19  brevity I just want to kind of go through these<br>20  relatively quickly, but on October 17th, 2011 I have<br>21  that there was exposed mesh that was excised and silver<br>22  nitrate applied.  Can you find that record and confirm<br>23  that for me?<br>24      A.    Yes.  October 17th, is that what you said?<br>25      Q.    Yes.<br><br>57:4-8 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>4      Q.    So she came in again with complications<br>5  associated with the mesh, true?<br>6      A.    True.<br>7      Q.    And then on August 29th, 2012.<br>8      A.    Yes.<br><br>57:13-15 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>13      Q.    Again, this was complications due to the<br>14  implanted mesh, correct?<br>15      A.    Correct.<br><br>57:24-58:3 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>24      Q.    And then on February 6th of 2013.<br>25      A.    Yes.<br><div align="right">58</div>1      Q.    Again, there was exposed mesh excised with<br>2  scissors and silver nitrate applied; is that correct?<br>3      A.    Correct.<br><br>58:7-25 [PLAINTIFFS] [Referencing Def. Ex. 15]<br>7      Q.    And then lastly if you'll turn to May 21st | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 8   of this year. | | |
| 9      A.    Yes. | | |
| 10      Q.    Okay.  And it, again, appears under | | |
| 11   procedure that exposed mesh excised with scissors and | | |
| 12   silver nitrate applied, correct? | | |
| 13      A.    Correct. | | |
| 14      Q.    What's the diagnosis there? | | |
| 15      A.    Complications due to genitourinary device, | | |
| 16   graft and implant. | | |
| 17      Q.    That's referring to the mesh, correct? | | |
| 18      A.    Correct. | | |
| 19      Q.    Okay.  So even up until less than two | | |
| 20   months ago Ms. Sanchez was having to come into your | | |
| 21   office to have mesh trimmed, fair? | | |
| 22      A.    Correct. | | |
| 23      Q.    And would it be fair to say, sitting here | | |
| 24   today, in your treatment of Ms. Sanchez that her | | |
| 25   problems are continuing to persist? | | |
| | | |
| 59:3 [PLAINTIFFS] | | |
| 3          THE WITNESS:  Yes. | | |
| | | |
| 59:5 | | |
| 5      Q.    By that I mean specific to problems with | | |
| 6   erosion of the mesh? | | |
| | | |
| 59:8 [PLAINTIFFS] | | |
| 8          THE WITNESS:  Correct. | | |
| | | |
| 59:10 [PLAINTIFFS] | | |
| 10      Q.    And pain? | | |
| | | |
| 59:12 [PLAINTIFFS] | | |
| 12          THE WITNESS:  Correct. | | |
| | | |
| 59:14-15 [PLAINTIFFS] | | |
| 14      Q.    And has she spoken with you at all about | | |
| 15   dyspareunia? | | |
| 59:17 | | |
| 17          THE WITNESS:  On occasion. | | |
| | | |
| 59:20-22 [PLAINTIFFS] | | |
| 20      Q.    So you know that at some point she has had | | |
| 21   problems with dyspareunia, correct? | | |
| 22      A.    Correct. | | |
| | | |
| 59:25-60:3 [PLAINTIFFS] | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 25      Q.   Do you have -- sitting here today do you<br>                                                                            60<br>1   have any criticisms of Ms. Sanchez over the course of<br>2   her treatment?<br>3      A.   No.<br><br>223:17-19 [PLAINTIFFS]<br>17          Do you believe that Ms. Sanchez'<br>18   post-implant symptoms were based on some defect in the<br>19   mesh that was placed in her?<br>223:21 [PLAINTIFFS]<br>21          THE WITNESS:  I have no idea.<br><br>224:14-16 [PLAINTIFFS]<br>14      Q.   Have you ever told anyone before today that<br>15   you believed her mesh was the cause of her symptoms?<br>16      A.   No.<br><br>224:23-225:1 [PLAINTIFFS]<br>23      Q.   You testified that you don't know whether<br>24   or not a defect in the medical device implanted in<br>25   Ms. Sanchez is what caused her injuries, right?<br>225<br>1      A.   Correct.<br><br>225:4-5 [PLAINTIFFS]<br>4      Q.   You're not saying that it didn't, right?<br>5      A.   Correct.<br><br>225:9-11 [PLAINTIFFS]<br>9      Q.   You're just saying you don't know one way<br>10   or the other?<br>11      A.   I just don't know one way or the other.<br><br>60:13-21 [PLAINTIFFS]<br>13          Doctor, I introduced myself before we<br>14   started this morning.  I'm Eva Weiler and I represent<br>15   Boston Scientific in this lawsuit that's been brought by<br>16   Ms. Sanchez.<br>17          Just to clarify from the beginning, you<br>18   understand that Boston Scientific has made no claims<br>19   against you in the course of this lawsuit; is that<br>20   right?<br>21      A.   Correct.<br><br>60:24-61:1 [PLAINTIFFS] | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 24      Q.    And that Boston Scientific is not claiming<br>25   malpractice against you?<br>                                                                        61<br>1      A.    Correct. |  |  |

1

## <u>Testimony Designated by Boston Scientific</u>

2

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 10:17-21 [BOSTON SCIENTIFIC]<br>17      Q.   To get a little bit of background can you<br>18   kind of start around 1999, and then just tell us when<br>19   did you first start using either a sling product, and do<br>20   you know what I mean by that?<br>21      A.   Yes.<br><br>10:23-25 [BOSTON SCIENTIFIC]<br>23           THE WITNESS:  So in -- I have to be honest,<br>24   I think it was January of 1999.  I'm not sure.  It was<br>25   in residency we started using TVT and using a Johnson<br>11:1-13 [BOSTON SCIENTIFIC]<br>1   and Johnson sling product for the bladder.  When I moved<br>2   here in July of '99 my partners and I were using the<br>3   same product.  Somewhere, and I have to be honest, I'm<br>4   not 100 percent sure when, whether it was in 2000, 2001,<br>5   whatever it was, we decided to change from the TVT<br>6   product to the Boston Scientific product, Advantage Fit.<br>7   Because of the design and the structure of the product,<br>8   it seemed to be less harmful to the patient and it was<br>9   better, so we started doing that.  In 2004, I think it<br>10   was 2004, maybe 2005 we started doing -- so I stopped<br>11   doing OB in 2003.  2004, 2005 we started putting mesh in<br>12   patients to improve their pelvic organ prolapse<br>13   procedures.<br><br>20:15-24  [BOSTON SCIENTIFIC]<br>15           THE WITNESS:  So with the pain, especially<br>16   with implanting the device and the procedure itself,<br>17   patients would have a low back, sort of upper buttock<br>18   pain that wouldn't go away, and I would tell patients<br>19   about that very specifically.  There's always a chance<br>20   of dyspareunia but, again, it was low.  In our practice<br>21   we found that as long as you didn't tighten the vagina<br>22   and you didn't put in any mesh too tight or shorten the<br>23   vagina or anything like that the chance of dyspareunia<br>24   was very low. | | |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 46:2-5 [BOSTON SCIENTIFIC]<br>2      Q.   During the course of your treatment with<br>3   her, with Ms. Sanchez, did she at some point start<br>4   having symptoms that you associated with the<br>5   implantation of the mesh product?<br><br>46:8  [BOSTON SCIENTIFIC]<br>8            THE WITNESS:  Yes.<br><br>47:9-12 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>9      Q.   Okay.  What's the date of this document?<br>10     A.   April 9th, 2010.<br>11     Q.   What type of document is this?<br>12     A.   It's an office visit.<br><br>47:18-25 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>18     Q.   Okay.  And it states that Ms. Sanchez was<br>19   coming to see you on April 9th of 2010 with abnormal<br>20   vaginal bleeding, pink discharge, having to wear a daily<br>21   panty liner, and feels something scratchy like a stitch<br>22   in her vagina; is that correct?<br>23     A.   Correct.<br>24     Q.   And can you tell, or do you have a<br>25   recollection how Ms. Sanchez felt about that?<br><br>48:3 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>3            THE WITNESS:  She was frustrated.<br><br>64:2-10 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>2      Q.   And do you currently treat SUI<br>3   surgically?<br>4      A.   Yes.<br>5      Q.   Do you currently treat POP surgically?<br>6      A.   Yes.<br>7      Q.   Okay.  Based on your clinical practice,<br>8   have you found that SUI can have a significant impact on<br>9   a woman's life?<br>10     A.   Yes.<br><br>64:13-20 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 13    Q.   How so?<br>14    A.   It's just so -- so if someone has really<br>15   significant stress urinary incontinence they end up<br>16   wearing pads every day, it, you know, changes their life<br>17   activities.  Sometimes they'll stop running or<br>18   exercising and just changing their lifestyle.<br><br>64:19-20, 22 [PLAINTIFFS' COMPLETENESS DESIGNATION]<br>*19    Q.   And was SUI having an impact on Ms. Sanchez*<br>*20   prior to 2010?*<br>*22          THE WITNESS:  Small amount.*<br><br>65:23-25 [BOSTON SCIENTIFIC]<br>23    Q.   How far back does your recollection of your<br>24   treatment of Ms. Sanchez go?<br>25    A.   I remember when she had surgery, I remember<br><br>66:1-9 [BOSTON SCIENTIFIC]<br>1   seeing her prior to surgery.  I don't remember the<br>2   specifics as much.  Since her surgery I remember her<br>3   from all the frequency of her visits and the unique<br>4   aspect of her care in my practice.<br>5    Q.   Okay.  What do you mean by that, unique<br>6   aspect of your --<br>7    A.   I don't have many patients who come so<br>8   frequently to have -- who have similar problems who need<br>9   such treatment, so she's definitely a unique patient.<br><br>68:3-4 [BOSTON SCIENTIFIC] [Def. Ex. 15]<br>3          Mark that as Exhibit 11, please.<br>4          Take a quick look, if you would.<br><br>68:11-14 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>11    Q.   It's basically -- this is a set of records<br>12   that we subpoenaed from your office, and it's everything<br>13   that we obtained when we asked for medical records to<br>14   come from you.<br><br>69:2-4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>2    Q.   Does this appear to contain medical records<br>3   for the treatment and care provided to Ms. Sanchez by<br>4   your practice? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 69:6-7 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>  6         THE WITNESS:  I don't think it's complete,<br>  7   but yes.<br><br>69:9-70:2 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>  9      Q.    Does it appear to contain a few more<br> 10   records than perhaps what we've looked at already<br> 11   today?<br> 12      A.    Absolutely.<br> 13      Q.    Okay.  And so are these -- would these<br> 14   medical records be documents that were made at or near<br> 15   the time of treatment provided to Ms. Sanchez?<br> 16      A.    Yes.<br> 17      Q.    Would they have been created by persons who<br> 18   had knowledge of events described in the medical<br> 19   records?<br> 20      A.    Yes.<br> 21      Q.    Is it part of your regular practice to keep<br> 22   such records in the treatment and care of your<br> 23   patients?<br> 24      A.    Yes.<br> 25      Q.    And they're maintained as a regular<br>                                                          70<br>  1   activity as a part of your practice?<br>  2      A.    Yes.<br><br>71:17-72:6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br> 17      Q.    Okay.  All right.  So then I guess the<br> 18   first kind of, for lack of a better term, progress note,<br> 19   I guess, that I have is actually dated 12/29/03 and<br> 20   that's record 110?<br> 21      A.    Correct.<br> 22      Q.    And did you actually see Ms. Sanchez on<br> 23   that date?<br> 24      A.    So the -- that's actually a history and<br> 25   physical from the hospital, so I would have seen her<br>                                                          72<br>  1   prior to that date in the office.<br>  2      Q.    And can you tell me what you were treating<br>  3   her for in the context of this record?<br>  4      A.    I was treating her for pain and her ovarian<br>  5   cyst.  That was on the ultrasound that you previously --<br>  6      Q.    What kind of pain was she experiencing --<br>72:9-73:3 [BOSTON SCIENTIFIC] [Referencing Def. Ex. | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

15]
9        Q.    -- at that time?
10      A.    My H&P says a bilateral lower quadrant
11  crampy pain.
12      Q.    Okay.  And you also mentioned history of
13  ovarian cysts it looks like down on the impression on
14  that -- looking at 110.
15      A.    Yes.
16      Q.    What history of ovarian cysts were you
17  referring to?
18      A.    The ultrasound.
19      Q.    And do ovarian cysts, can they cause
20  pain?
21      A.    Yes.  There was another -- there's a few
22  ultrasounds in here, that's where I was getting some of
23  that.
24      Q.    If you look to Page 74 of that collection,
25  it looks like she was seen on January 30th, 2006.
                                                    73
1      A.    Uh-huh.
2      Q.    Is that correct?
3      A.    Correct.

73:6-16 [BOSTON SCIENTIFIC] [Referencing Def. Ex.
15]
6      Q.    And can you tell me what she was seen for
7  on that date?
8      A.    She was seen for her well woman exam, and
9  it looks like she had some -- had a history of ovarian
10  cysts.  It says history of hypertension, dyslipidemia,
11  chronic back and neck pain, Leiden factor V, history of
12  DVTs.
13      Q.    So am I correct, I'm reading at the top,
14  "She...had some significant medical problems in the
15  past two years."  Did I read that correctly?
16      A.    Uh-huh.

73:19-25 [BOSTON SCIENTIFIC] [Referencing Def. Ex.
15]
19      Q.    And that included "Episodes of shortness of
20  breath, palpitations, chest pain, left-sided numbness."
21  Did I read that correctly?
22      A.    Correct.
23      Q.    "She has a history of Leiden factor V."
24  Did I read that correctly?
25      A.    Right.

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| | TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|---|
| 1 | | | |
| 2 | 74:1-25 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] | | |
| 3 | 1     Q.    What is Leiden factor V? | | |
| | 2     A.    It's a coagulation abnormality, so it's a | | |
| 4 | 3   blood dysplasia that -- tripping over my words -- it | | |
| | 4   predisposes you to blood clots and DVTs, and therefore | | |
| 5 | 5   DVT. | | |
| | 6     Q.    The next sentence says, "She was worked up | | |
| 6 | 7   for DVTs."  Is that right? | | |
| | 8     A.    Yes. | | |
| 7 | 9     Q.    Is that deep vein thrombosis? | | |
| | 10     A.    Correct. | | |
| 8 | 11     Q.    What's deep vein thrombosis? | | |
| | 12     A.    It's a clot in a vein. | | |
| 9 | 13     Q.    And the next sentence, "She was placed on | | |
| 10 | 14   Coumadin" -- I'm sorry, strike that.  Two sentences | | |
| | 15   down, "She was placed on Coumadin by Dr. | | |
| 11 | Dichmann." | | |
| | 16     A.    Correct. | | |
| 12 | 17     Q.    What's Coumadin? | | |
| | 18     A.    Coumadin is a blood thinner. | | |
| 13 | 19     Q.    Do you know why she was prescribed that? | | |
| 14 | 20     A.    Because I'm assuming she had her DVT and | | |
| | 21   they were concerned. | | |
| 15 | 22     Q.    Down a little bit further it says, "She's | | |
| 16 | 23   also been found to have some cervical and lumbar disk | | |
| | 24   bulging.  This may be causing some of the symptoms." | | |
| 17 | 25   Did I read that correctly? | | |
| 18 | 75:1-14 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] | | |
| 19 | 1     A.    Correct. | | |
| 20 | 2     Q.    Do you know what that's in reference to in | | |
| | 3   terms of that may be causing some of the symptoms? | | |
| 21 | 4     A.    Well, I think down at the bottom under | | |
| | 5   Impression it says, "Chronic back and neck pain with | | |
| 22 | 6   radiculopathy."  So some of the left-sided numbness | | |
| | 7   that was mentioned above, I'm assuming that goes | | |
| 23 | 8   together. | | |
| 24 | 9     Q.    Okay.  It also says, "She's been seeing | | |
| | 10   Dr. Ente and Dr. Patel for pain management."  Did I read | | |
| 25 | 11   that correctly? | | |
| 26 | 12     A.    Correct. | | |
| | 13     Q.    So is it your understanding that at that | | |
| 27 | 14   time she was experiencing chronic pain? | | |
| 28 | | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 75:16-76:6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>16     THE WITNESS:  Neck pain, chronic back and<br>17  neck pain.<br>18  BY MS. WEILER:<br>19     Q.   Then it says, "She does have a history of<br>20  ovarian cysts.  She did have a laparoscopy, right<br>21  ovarian cystotomy in 12/2003."<br>22     A.   Correct.<br>23     Q.   Besides my pronunciation did I read that<br>24  correctly?<br>25     A.   Yes, you did.<br>                                    76<br>1     Q.   What is that procedure, ovarian<br>2  cystotomy?<br>3     A.   Cystotomy is where you make -- you<br>4  essentially pop the ovarian cyst to relieve the pain.<br>5     Q.   Is that a surgical procedure?<br>6     A.   It is.<br><br>76:12-18 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>12     Q.   It also says, "She's concerned she might<br>13  have a recurrence of cysts as she has intermittent right<br>14  versus left abdominal pain mid cycle."  Did I read that<br>15  correctly?<br>16     A.   Correct.<br>17     Q.   So is it your understanding that she was<br>18  experiencing abdominal pain at that time?<br><br>76:20 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>20     THE WITNESS:  Correct.<br><br>76:22-23 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>22     Q.   It also looks like she saw Joy Ivey on<br>23  2/22/07.  That's at 72 is where I'm looking.<br><br>77:3-4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>3     Q.   And can you tell me why she was seen on<br>4  that date?<br><br>77:6-8 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>6     THE WITNESS:  It says that she was there<br>7  for her -- again, her well woman exam, and she was also<br>8  having right lower quadrant pain mid cycle. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 77:10-12 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>10    Q.   It looks like under Female Reproductive it<br>11   says, "Pelvic pain."  Was she having pelvic pain at that<br>12   time?<br><br>77:14-16 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>14         THE WITNESS:  This is -- the review of<br>15   systems is a checklist that the patient fills out, and<br>16   so she said that she was.<br><br>77:18-78:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>18    Q.   Okay.  And then likewise, just below there,<br>19   Gastroenterology, again, where it says, "Abdominal pain,<br>20   yes," does that indicate that Ms. Sanchez reported<br>21   having abdominal pain at that time?<br>22    A.   Yes.<br>23    Q.   Down below under Medical History I see it<br>24   says, "Irritable bowel syndrome, yes."  What's irritable<br>25   bowel syndrome?<br>78<br>1    A.   When you have irritable bowel, when you<br>2   have issues with your bowels.  You can have diarrhea or<br>3   you can have constipation.<br>4    Q.   Can that be painful?<br><br>78:6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>6         THE WITNESS:  Yes.<br><br>79:2-80:3 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>2    Q.   So if you could look at -- now I'm looking<br>3   at Page 69, it's a record progress note dated May 14,<br>4   2007.<br>5    A.   Uh-huh, yes.<br>6    Q.   And did you see Ms. Sanchez on that date?<br>7    A.   I did.<br>8    Q.   For what purpose?<br>9    A.   Abnormal vaginal bleeding, and it says,<br>10   "Fatigue."<br>11    Q.   Am I right that she had some bleeding in<br>12   the past as well, based on what we saw in the records?<br>13    A.   Yes. | | |

38

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 14    Q.    I see here "Patient has Leiden factor V and 15  a history of DVTs, on Coumadin, and is not a candidate 16  for hormonal treatments."  Did I read that correctly? 17    A.    Yes. 18    Q.    Why is she not a candidate for hormonal 19  treatment? 20    A.    Because it can predispose you to blood 21  clots, and so combined with Leiden factor V that can be 22  very dangerous. 23    Q.    And I see the last sentence, "Patient is 24  frustrated with her bleeding, desires treatment."  Did I 25  read that correctly? 80 1    A.    Correct. 2    Q.    So am I right that the bleeding was causing 3  her some problems at that time? | | |
| 80:5 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] 5        THE WITNESS:  Correct. | | |
| 80:7-81:3 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] 7    Q.    Down at the bottom under Treatment it says, 8  "After a lengthy discussion with the patient, she has 9  decided to proceed with a diagnostic hysteroscopy with 10  D&C.  She will stop her Coumadin."  Did I read that 11  correctly? 12    A.    Correct. 13    Q.    What's the diagnostic hysteroscopy with 14  D&C? 15    A.    The diagnostic hysteroscopy is when you put 16  a camera inside your uterus to see if there's a reason 17  for her bleeding, a polyp or some abdominal tissue. D&C 18  is where then you would scrape down all the lining to 19  check it.  Also, with her sister's history of 20  endometrial cancer that was a concern. 21    Q.    "And she will stop her Coumadin."  Why was 22  she going to stop Coumadin? 23    A.    Because if you perform surgery while a 24  patient is on an anticoagulant it can be very dangerous 25  as well. 81 1    Q.    Is that because they don't clot the same 2  way as most people do? 3    A.    Correct. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 81:21-82:9 [BOSTON SCIENTIFIC]<br>21      Q.   Okay.  And can you describe what you do in<br>22   that procedure?<br>23      A.   So the patient's put to sleep, we through<br>24   the vagina put a scope into -- so I dilate her cervix,<br>25   put a scope and a camera into her uterus, look around,<br>82<br>1   take pictures, look for any abnormalities, take the<br>2   camera out.  The D is the dilatation, the C for<br>3   curettage.  So then I do a scrapping of the endometrium,<br>4   send all that tissue to pathology, and then go back and<br>5   take another look with the scope, and then take all the<br>6   instruments out.<br>7      Q.   So looking at that op note, the<br>8   preoperative diagnosis was menorrhagia; is that right?<br>9      A.   Right.<br><br>82:10-12 [BOSTON SCIENTIFIC]<br>10      Q.   What's that?<br>11      A.   That's excessive bleeding.<br><br>82:12 [PLAINTIFFS COMPLETENESS DESIGNATION]<br>*12      Q.   Can that be painful?*<br>*82:14-15*<br>*14           THE WITNESS:  Not usually.  You would call*<br>*15   it something else.*<br><br>82:19-20 [BOSTON SCIENTIFIC]<br>19      Q.   She had been experiencing some pelvic pain<br>20   at that time?<br>82:22<br>22           THE WITNESS:  Okay.<br><br>82:24-83:18 [BOSTON SCIENTIFIC] [Referencing Def.<br>Ex. 15]<br>24      Q.   Is that right?<br>25      A.   From my note I guess, I think.  I think it<br>                                                              83<br>1   was more bleeding at that time, but with her history of<br>2   ovarian cysts and her irritable bowel and everything<br>3   else she has pain.<br>4      Q.   Now, am I also right that she has had a<br>5   past tubal ligation?<br>6      A.   Yes.<br>7      Q.   And is that basically -- well, describe<br>8   what that is.<br>9      A.   Tubal ligation is where you occlude the | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

10  fallopian tubes to prevent future pregnancies.

11      Q.    Is that done under general anesthesia as

12  well?

13      A.    Yes.

14      Q.    And that was performed back in 1998?

15      A.    Yes.  It can also be performed under spinal

16  anesthesia if you're having a cesarean section.

17      Q.    Can a tubal ligation cause scarring?

18      A.    It can.

**83:21-84:5 [BOSTON SCIENTIFIC]**

21      Q.    And is scarring the same thing as

22  adhesions?

23      A.    Yes.

24      Q.    Okay.  And the procedure you did on 6/2007

25  can that cause scarring?

                                                        84

1      A.    6/2007.

2      Q.    That's the diagnostic -- I still can't

3  pronounce it.

4      A.    Hysteroscopy and D&C.  In theory it can,

5  but it's more rare.

**84:14-24 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]**

14      Q.    If you so turn to -- this is 67, this is a

15  progress note dated 6/8/2007.  Did you see Ms. Sanchez

16  on that date?

17      A.    I did.

18      Q.    And for what purpose?

19      A.    It says postoperative problems, she had a

20  vaginal discharge and an odor.  So she had a vaginal

21  infection after our procedure.

22      Q.    And then if you could turn to Page 64, the

23  progress note dated 4/29/08.

24      A.    Yes.

**85:3-17 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]**

3      Q.    Do you know why she was seen -- do you know

4  why Ms. Sanchez was seen on that date?

5      A.    It says for her annual exam, well woman

6  visit, as well as discomfort, pain in her ovaries.

7      Q.    So it looks like in the history of present

8  illness it says, and is recently "experiencing pelvic

9  pain and bloating."  Is that right?

10      A.    Correct.

11      Q.    It also says, "She also states for several

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 12   months she's not completely emptying her bladder."  Is<br>13   that right?<br>14       A.   Correct.<br>15       Q.    And that after she voids and stands up she<br>16   releases more urine; is that correct?<br>17       A.    Correct.<br><br>85:23-86:9 [BOSTON SCIENTIFIC] [Referencing Def. Ex.<br>15]<br>23       Q.    It also says under Examination "Moderate<br>24   cystocele with valsalva."<br>25       A.    Yes.<br>                                                              86<br>1    Q.    What's that?<br>2       A.    Valsalva is when you bear down, and so she<br>3   had -- it looks like Judy Weber had the patient bear<br>4   down.  And cystocele is where your bladder starts<br>5   prolapsing and bulging down.<br>6       Q.    So if that was indeed the finding of Judy<br>7   Weber on 4/29/2008, does that tell you that Ms. Sanchez<br>8   was having some prolapse at that time?<br>9       A.    The starting of prolapse, yes.<br><br>86:19-87:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex.<br>15]<br>19       Q.    Okay.  If you could turn to 62, this is<br>20   dated 4/30/2008 progress note.<br>21       A.    Uh-huh.<br>22       Q.    Did you see Ms. Sanchez on that date?<br>23       A.    I did.<br>24       Q.    For what purpose?<br>25       A.    It says, "Consult to discuss surgery."<br>                                                              87<br>1    Q.    What surgery were you referring to?<br>2       A.    It looks like stress incontinence.<br>3       Q.    So --<br>4       A.    Pubovaginal sling.<br><br>87:12-16 [BOSTON SCIENTIFIC] [Referencing Def. Ex.<br>15]<br>12       Q.    So what did that appointment involve?<br>13       A.    It looks like I spoke to her about her<br>14   bladder issues and discussed different treatment.  And<br>15   it looks like I treated her empirically for a urine<br>16   infection.<br><br>87:25-88:2 | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 25    Q.   So at that time she was complaining of loss | | |

88

1  of urine with coughing, sneezing and movement?
2    A.   Correct.

88:6-16 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
6    Q.   But it says that she was experiencing two
7  episodes of nocturia each night, what's that?
8    A.   Nocturia is when you wake up in the middle
9  of the night to go to the bathroom.
10    Q.   Okay.  And it also says, "Patient feels her
11  symptoms have progressed over the past two months." Is
12  that right?
13    A.   Yes.
14    Q.   Does that mean she feels like they're
15  getting worse?
16    A.   Uh-huh.

88:19-24 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
19    Q.   It also says, "Now she does not feel as if
20  she completely empties her bladder."  Did I read that
21  correctly?
22    A.   Correct.
23    Q.   Is that significant to you in terms of your
24  treatment of her?

89:1-13 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
1        THE WITNESS:  Sure.  I mean --
2  BY MS. WEILER:
3    Q.   How so?
4    A.   It's describing a type of bladder
5  dysfunction, so if we're talking about urinary problems
6  that she's having that's something you consider.
7    Q.   Is that at all associated with or
8  indicative of SUI?
9    A.   It can be.
10    Q.   It also says, "Patient also has right-sided
11  cramping associated with bloating and excessive
12  flatulence."  Is that right?
13    A.   Correct.

90:9-17 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 9  of tilted towards.<br>10      Q.    Now, under your treatment it says, "No. 3,<br>11  Stress incontinence, Kegel exercises were explained."<br>12  What are Kegel exercises?<br>13      A.    They're exercises to strengthen the pelvic<br>14  floor muscles.<br>15      Q.    And why did you recommend she do that?<br>16      A.    It's a nonsurgical treatment for stress<br>17  incontinence.<br><br>91:17-92:6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>17      Q.    And then below it says, "Brochure on<br>18  pubovaginal sling with Uretex tape was given to the<br>19  patient to review."  What's Uretex tape?<br>20      A.    That was another product that we were using<br>21  I guess before the Advantage Fit.  Forgot I used it.<br>22      Q.    Why did you provide that to Ms. Sanchez at<br>23  that time?<br>24      A.    For information.  She was requesting<br>25  treatment.<br>                                          92<br>1      Q.    And was doing a surgical procedure for her<br>2  SUI symptoms a possible option for her at that time?<br>3      A.    It was something for her to think about.<br>4      Q.    Were you recommending she have that<br>5  procedure at that time?<br>6      A.    No, informational.<br><br>92:12-17 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>12      Q.    Yes.  This one is 11/10/2008.  It appears<br>13   that Judy Weber saw Ms. Sanchez on 11/10/2008; is that<br>14   right?<br>15      A.    Correct.<br>16      Q.    And was she seen for pelvic pain on that<br>17  date?<br>92:19 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>19           THE WITNESS:  That's what it says.<br><br>19:21-23 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>21      Q.    Yeah.  And it also appears that -- it says,<br>22  "She has been seen several times with similar<br>23  complaints."  Is that right? | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 92:25 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>25          THE WITNESS:  That's what it says.<br><br>93:2-8 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>2      Q.   And it says, "She had pelvic ultrasound in<br>3   4/08 which revealed a 1.7 centimeter ovarian cyst."  Did<br>4   I read that correctly?<br>5      A.   Correct.<br>6      Q.   It also says just below, "Since then she's<br>7   been evaluated Dr. Jahnke and been diagnosed with<br>8   irritable bowel syndrome."  Did I read that correctly?<br><br>93:10 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>10          THE WITNESS:  Correct.<br><br>93:12-13 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>12      Q.   It looks like she was complaining of both<br>13   diarrhea and constipation, correct?<br><br>93:15 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>15          THE WITNESS:  Correct.<br><br>93:24-94:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>24      Q.   It looks like there was an imaging study<br>25   done, I'm looking at record 96.  It looks like there was<br>94<br>1   one performed on 11/10/2008; is that right?<br>2      A.   Yes.<br>3      Q.   And what were the findings of that study?<br>4      A.   Extensive fecal retention.<br><br>94:7-9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>7      Q.   Now, it looks like she was then again seen<br>8   December 2009, looking at record 58; is that correct?<br>9      A.   Correct.<br><br>94:19-95:13 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>19      Q.   And in the history of present illness it<br>20   says, "She complains of her bladder being lower and<br>21   occasional loss of urine with activity."  Is that<br>22   correct?<br>23      A.   Correct.<br>24      Q.   Other than the Kegel exercises that you had<br>25   recommended at that prior visit, and providing her with | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

95

1  that Uretex brochure, had you prescribed any additional
2  treatment for Ms. Sanchez' urinary symptoms beyond that
3  up until this point?
4      A.   No.  I treated her empirically for a UTI,
5  but no.
6      Q.    It looks like under Assessments, I'm
7  looking at now at Page 59, the second page of that
8  record it says, "Cystocele, midline"?
9      A.   Uh-huh.
10     Q.    What does cystocele, midline mean?
11     A.    So it means her bladder was bulging down in
12  the -- the nurse practitioner wrote a grade 2 cystocele
13  in her examination.

95:20-25 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
20     Q.    Now, it also says under Treatment
21  "Cystocele midline, pelvic support problems, brochure
22  given." Do you know what brochure that would have
23  been?
24     A.    It's an ACOG brochure.  We give out ACOG
25  brochures.

96:7-97:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
7      Q.    And it looks like she did a follow-up with
8  you on 12/14/2009; is that correct?
9      A.    Correct.
10     Q.    And so the reason for that appointment as
11  documented was bladder problems, right?
12     A.    Correct.
13     Q.    And how did she present that day?
14     A.    She just came in and we were discussing
15  where it says that she loses urine, coughing, sneezing,
16  laughing, movement, can also have problems with
17  intercourse with urination and it bothers her.
18     Q.    So that says -- in the history of present
19  illness it says, "Causing her to wear a daily panty
20  liner."  Is that right that's she now wearing -- saying
21  she's wearing a pad?
22     A.    It's changed, uh-huh.
23     Q.    That's different from what we saw before,
24  right?
25     A.    Correct.

97

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 1      Q.   It also says, "Patient can also urinate<br>2   with intercourse, which has become embarrassing."  Did I<br>3   read that correctly?<br>4      A.   Correct.<br><br>97:8-12 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>8      Q.   It says, "Also patient admits to urinary<br>9   frequency during the day as well as two to three<br>10   episodes of nocturia at night."  What's urinary<br>11   frequency?<br>12      A.    Where you're urinating more frequently.<br><br>97:16-21 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>16      Q.    And it looks like also now she's having<br>17   perhaps one more episode of nocturia per night than she<br>18   had complained of prior?<br>19      A.   Correct.<br>20      Q.    So am I right that it sounds like her SUI<br>21   is getting worse?<br>97:23<br>23           THE WITNESS:  Yes.<br><br>97:25-99:9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>25      Q.    And it was having an effect on her daily<br>                                           98<br>1   life?<br>2      A.   It seems to be.<br>3      Q.    Now, under Examination I see it says,<br>4   "Large midline cystocele."<br>5      A.   Correct.<br>6      Q.    What does that mean to you in terms of the<br>7   severity of her cystocele?<br>8      A.   It's increasing from my -- I should say<br>9   it's increasing from my exam from before.  It's hard to<br>10   sort of judge what your exam and what somebody else's<br>11   exam is, but at least on my previous exam I didn't<br>12   mention it after Judy Weber had seen it, and now I'm<br>13   mentioning it.  I don't know if it's worse from the<br>14   other nurse practitioner.<br>15      Q.   Sure.  Now, when Counsel was asking<br>16   questions earlier you had commented that sometimes<br>17   pelvic organ prolapse can actually have a greater impact<br>18   on a woman's life than SUI; is that right? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 19      A.   Usually.<br>20      Q.   Why is that?<br>21      A.   There is just more symptoms involved.<br>22      Q.   Such as?<br>23      A.   Discomfort or problems with intercourse,<br>24  more problems with urinary symptoms.  It's not just with<br>25  coughing, sneezing, now you can't necessarily empty your<br><div align="right">99</div>1  bladder well, you can feel a bulge vaginally.  It can<br>2  then interfere with more activities than just stress<br>3  incontinence, things like that.<br>4      Q.   So Ms. Sanchez was coming to you at this<br>5  time because she was frustrated with the symptoms that<br>6  she was experiencing; is that right?<br>7      A.   Correct.<br>8      Q.   And she was concerned about the impact it<br>9  was having on her life, correct?<br><br>99:11 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>11          THE WITNESS:  Correct.<br>99:13-100:2 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]<br>13      Q.   It says down under Treatment -- well, under<br>14  Assessment it says, "Incontinence" and "cystocele."  Is<br>15  that right?<br>16      A.   Yes.<br>17      Q.   So then under Treatment it says,<br>18  "Incontinence was explained and discussed with patient.<br>19  Both surgical and medical treatments were explained."<br>20  What treatments were explained with her?<br>21      A.   So that's where we would talk about<br>22  medical, whether you're using medicine or whether you're<br>23  using Kegel exercises or sending somebody to the<br>24  physical therapist.  Or surgical, whether you just say<br>25  enough and you have surgery and see if that helps.  And<br><div align="right">100</div>1  I like to discuss both with the patients because many<br>2  times they need both.<br>100:6 [BOSTON SCIENTIFIC]<br>6      Q.   Does SUI usually improve without treatment?<br>100:8 [BOSTON SCIENTIFIC]<br>8          THE WITNESS:  No.<br>100:10-11 [BOSTON SCIENTIFIC]<br>10      Q.   And does pelvic organ prolapse usually | | |

| | TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|---|
| 1 | 11  improve without treatment? | | |
| 2 | 100:13 [BOSTON SCIENTIFIC] | | |
| 3 | 13           THE WITNESS:  No. | | |
|   | 100:15-16 [BOSTON SCIENTIFIC] | | |
| 4 | 15        Q.    So will SUI -- well, what's the natural | | |
|   | 16   progression of SUI without treatment? | | |
| 5 | 100:18 [BOSTON SCIENTIFIC] | | |
| 6 | 18           THE WITNESS:  It gets worse. | | |
|   | 100:20-22 | | |
| 7 | 20        Q.    And is the same for pelvic organ | | |
|   | 21   prolapse? | | |
| 8 | 22        A.    Yes. | | |
| 9 | 100:25-101:2 [BOSTON SCIENTIFIC] | | |
|   | 25        Q.    Am I correct that you diagnosed Ms. Sanchez | | |
| 10 | 101 | | |
|   | 1   with both SUI and pelvic organ prolapse? | | |
| 11 | 2        A.    Yes. | | |
| 12 | 102:5-16 [BOSTON SCIENTIFIC] | | |
|   | 5        Q.    Are there different degrees or severity of | | |
| 13 | 6   POP? | | |
|   | 7        A.    Yes. | | |
| 14 | 8        Q.    Did you assess the degree of severity of | | |
|   | 9   Ms. Sanchez'? | | |
| 15 | 10        A.    Yes, in the sense -- so some people use a | | |
| 16 | 11   POP quiz and they use many different tools, and there | | |
|   | 12   are some people who would argue that it's still | | |
| 17 | 13   inaccurate and it's difficult to describe.  And so we in | | |
|   | 14   our office have sort of gone with small, moderate, | | |
| 18 | 15   large.  So at some point I said a large cystocele, but I | | |
| 19 | 16   did not discuss in my note here much else than that. | | |
| 20 | 102:25-103:9 [BOSTON SCIENTIFIC] | | |
|   | 25        Q.    Okay.  How about for pelvic organ prolapse, | | |
| 21 | 103 | | |
|   | 1   what treatment options were available at that time? | | |
| 22 | 2        A.    A pessary.  Same thing with Kegels, | | |
|   | 3   sometimes patients think they help, but they're not -- | | |
| 23 | 4   they are less nonsurgical treatment. | | |
|   | 5        Q.    Do you prescribe pessaries for your | | |
| 24 | 6   patients? | | |
|   | 7        A.    A lot. | | |
| 25 | 8        Q.    Do you find them to be effective? | | |
| 26 | 9        A.    In many patients. | | |
| 27 | 103:15-104:6 [BOSTON SCIENTIFIC] | | |
| 28 | 15        A.    So with a patient who's not had a | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 16   hysterectomy, many times the uterus with a strong cough<br>17   or movement can push the pessary out, which can be very<br>18   embarrassing and cause problem.  Somebody who is<br>19   sexually active can have difficulty if they cannot<br>20   remove the pessary themselves, obviously an obstruction<br>21   to intercourse.  So it just depends, depends on the age<br>22   and their activity.<br>23       Q.   Do you tend to prescribe those more in<br>24   older women?<br>25       A.   Yes.<br><div align="right">104</div>1       Q.   How old was Ms. Sanchez in December of<br>2   2009?<br>3       A.   She was 43.<br>4       Q.   And is she of the age where you would<br>5   normally prescribe a pessary?<br>6       A.   No.<br><br>104:10-105:17 [BOSTON SCIENTIFIC]<br>10       Q.   Have you ever used bulking agents for the<br>11   treatment of SUI?<br>12       A.   I don't do that myself, I send them out to<br>13   a urogynecologist.<br>14       Q.   What, again, talking about the time of<br>15   Ms. Sanchez' surgery, what surgical options were<br>16   available for the treatment of SUI?<br>17       A.   At that time I performed -- at that time I<br>18   was only doing pubovaginal sling.  I do not do Burches,<br>19   I do not do other surgeries, but I do send patients to<br>20   have other procedures done, whether -- it's usually a<br>21   urogynecologist, one is in Santa Barbara at that time,<br>22   Ventura.<br>23       Q.   And you said you don't do the Burch,<br>24   what's the Burch?<br>25       A.   A Burch is another procedure for stress<br><div align="right">105</div>1   urinary incontinence.  Open or laparoscopic procedure.<br>2   It's just a more invasive procedure.<br>3       Q.   Does it involve using sutures into the<br>4   patient's own tissue?<br>5       A.   Yes.<br>6       Q.   And why don't you perform that type of<br>7   surgery?<br>8       A.   When I was trained I was trained on both, | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 9   and the studies that came out at that time showed that<br>10   the pubovaginal sling was more successful in<br>11   treatment.<br>12       Q.   And you've continued to use the pubovaginal<br>13   sling in lieu of the Burch procedure?<br>14       A.   Correct.<br>15       Q.   How about have you ever done repairs with<br>16   autologous tissue?<br>17       A.   No.<br><br>105:22-106:12 [BOSTON SCIENTIFIC]<br>22       Q.   Have you ever been trained to do that?<br>23       A.   No.<br>24       Q.   How about cadaveric tissue, ever used<br>25   cadaveric tissue for the treatment of SUI?<br>                                                      106<br>1       A.   I haven't.  Urologists in town have.<br>2   Again, our practice, we send a lot of patients to them<br>3   or have them take care of it.<br>4       Q.   Did you discuss any of those options with<br>5   Ms. Sanchez?<br>6       A.   In my discussions with her I don't see that<br>7   specifically on paper, but I know in general I always<br>8   talk about those things and talk about options of<br>9   sending a patient to a different specialist.<br>10       Q.   And did you recommend a particular type of<br>11   surgical procedure for the treatment of her SUI?<br>12       A.   For her SUI, pubovaginal sling.<br><br>106:14-107:17 [BOSTON SCIENTIFIC] [Referencing Def.<br>Ex. 15]<br>14       A.   As well as treatment of her prolapse.<br>15       Q.   And why did you make that recommendation<br>16   for her at that time?<br>17       A.   I thought that would be the best treatment<br>18   for her symptoms.<br>19       Q.   How about for POP, at that time what<br>20   surgical options would have been available to<br>21   Ms. Sanchez for the treatment of her POP?<br>22       A.   Hysterectomy and repair of a cystocele and<br>23   rectocele, and whether you then additionally use mesh or<br>24   not, that was another discussion.<br>25       Q.   Was there a native tissue repair option for<br>                                                      107<br>1   the treatment of POP?  Do you know what I mean by native | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 2   tissue?  Was there a non-mesh procedure -- | | |
| 3      A.   Yes. | | |
| 4      Q.   -- that could have been offered to her? | | |
| 5      A.   Yes. | | |
| 6      Q.   Did you talk to her about this | | |
| 7   possibility? | | |
| 8      A.   Absolutely. | | |
| 9      Q.   Did you recommend that she have that type | | |
| 10  of procedure? | | |
| 11      A.   No, I recommended using a mesh procedure. | | |
| 12      Q.   And why didn't you recommend the non-mesh | | |
| 13  procedure? | | |
| 14      A.   I felt at her age and her activity level | | |
| 15  that she would benefit from mesh.  It would provide -- | | |
| 16  it would provide a longer repair and there would be less | | |
| 17  chance of recurrence down the road. | | |
| | | |
| 107:21-108:21 [BOSTON SCIENTIFIC] | | |
| 21      Q.   Are you trained to do abdominal -- | | |
| 22      A.   Like a sacrocolpopexy? | | |
| 23      Q.   Yes. | | |
| 24      A.   I scrubbed in in residency.  I wouldn't try | | |
| 25  to do one now. | | |
|                                                                 108 | | |
| 1      Q.   Have you recommended any of your patients | | |
| 2   to have an abdominal sacrocolpopexy before? | | |
| 3      A.   Uh-huh. | | |
| 4      Q.   And why did you make those recommendations | | |
| 5   in that instance? | | |
| 6      A.   Same thing, if I didn't think that she was | | |
| 7   a candidate for mesh, if I felt there was going to be | | |
| 8   some other problems or if I felt she had had multiple | | |
| 9   surgeries and had still had recurrent issues I would | | |
| 10  then have her see someone much more specialized. | | |
| 11      Q.   And why weren't you making those | | |
| 12  recommendations initially? | | |
| 13      A.   Because I thought hers was very | | |
| 14  straightforward and could be -- | | |
| 15      Q.   The surgical treatment options we talked | | |
| 16  about for SUI, do those also come with a risk of | | |
| 17  potential pain associated? | | |
| 18      A.   Yes. | | |
| 19      Q.   And the non-mesh surgical procedures | | |
| 20  available for the treatment of POP, those also come with | | |
| 21  a risk of pain? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 108:23 [BOSTON SCIENTIFIC]<br>23          THE WITNESS:  Sure.<br><br>108:25-109:2 [BOSTON SCIENTIFIC]<br>25      Q.   Am I correct that all surgical procedures<br>109<br>1  for the treatment of SUI have a potential risk of<br>2  pain?<br><br>109:4<br>4          THE WITNESS:  Yes.<br>109:6-8 [BOSTON SCIENTIFIC]<br>6      Q.   And am I correct that all surgical<br>7  procedures for the treatment of POP have a potential<br>8  risk of pain?<br><br>109:10-11 [BOSTON SCIENTIFIC]<br>10          THE WITNESS:  I think any surgery has a<br>11  potential risk of pain.<br>109:13-18 [BOSTON SCIENTIFIC]<br>13      Q.   That would include surgical procedure for<br>14  POP?<br>15      A.   Absolutely.<br>16      Q.   Am I also correct that all surgical<br>17  procedures available for the treatment of SUI have a<br>18  possible risk of failure?<br>109:20<br>20          THE WITNESS:  Yes.<br><br>109:22-111:2 [BOSTON SCIENTIFIC]<br>22      Q.   And by failure I'm referring here to<br>23  potential recurrence, for instance?<br>24      A.   Correct.<br>25      Q.   Am I also correct that all surgical options<br>110<br>1  available for the treatment of POP also come with a<br>2  potential risk of failure?<br>3      A.   Correct.<br>4      Q.   And that would include recurrence?<br>5      A.   Correct.<br>6      Q.   When was the first time that you used<br>7  synthetic mesh for the treatment of SUI?<br>8      A.   I think it was -- it's somewhere in 2004,<br>9  2005.<br>10      Q.   Now, I thought you said you also used some<br>11  in your residency; is that incorrect?<br>12      A.   Not mesh for -- I was -- | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 13      Q.   For SUI.<br>14      A.   Oh, I'm sorry, for SUI.  I apologize.  So<br>15   the 2004, 2005 is for the POP.  For SUI it was starting<br>16   back in residency.<br><br>19      Q.   Okay.  And over the course of your<br>20   residency and practice how many times, if you can<br>21   estimate for me, have you placed synthetic mesh for the<br>22   treatment of SUI?<br>23      A.   Oh, I would have no idea.<br>24      Q.   Any way to estimate?<br>25      A.   I mean hundreds.<br>                              111<br>1      Q.   Okay.  And so have your patients had<br>2   success with those placements?<br><br>111:4-8 [BOSTON SCIENTIFIC]<br>4         THE WITNESS:  Yes.<br>5   BY MS. WEILER:<br>6      Q.   Do you know how many of the patients in<br>7   whom you have placed synthetic mesh for the treatment of<br>8   SUI, how many have had complications?<br><br>111:10-15 [BOSTON SCIENTIFIC]<br>10        THE WITNESS:  Sometimes patients don't come<br>11   back to you, so you don't always have an accurate -- so<br>12   I would say SUI, just a handful of patients.<br>13   BY MS. WEILER:<br>14      Q.   Is a handful less than ten?<br>15      A.   Yeah.<br>111:17<br>17        THE WITNESS:  That I know of.<br><br>111:19-112:2 [BOSTON SCIENTIFIC]<br>19      Q.   So you started doing placement of mesh for<br>20   POP about 2004, right?<br>21      A.   Correct.<br>22      Q.   And can you estimate for me how many times<br>23   you have placed synthetic mesh for the treatment of<br>24   POP?<br>25      A.   Same thing.  I mean, it would be, I don't<br>                              112<br>1   know, up to 20 per year, you know, since then, so a<br>2   hundred-ish. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 112:8-13 [BOSTON SCIENTIFIC]<br>8    Q.    Approximately?<br>9    A.    Maybe more.<br>10    Q.    Okay.  And so you've had success in placing<br>11   those synthetic mesh for the treatment of POP in your<br>12   patients?<br>13    A.   Yes.<br><br>112:16-17, 19, 23-25 [PLAINTFFS COMPLETENESS DESIGNATION]<br>16      Q.    And to the extent you know, how many of<br>17   those patients have had complications?<br>19        THE WITNESS:  More than the SUI patients.<br>21    Q.    Can you estimate for me?<br>23        THE WITNESS:  I have no idea.<br>24   BY MS. WEILER:<br>25    Q.    Is it less than 20?<br><br>113:2-8 [PLAINTIFFS' COMPLETENESS DESIGNATION]<br>2        THE WITNESS:  You know, it's hard -- it's<br>3   hard because there's moments like if somebody has an<br>4   erosion and you treat it once and it goes away, that<br>5   doesn't seem like a big ordeal.  Somebody like this<br>6   patient has to come multiple years, multiple times,<br>7   that's completely different.  So I mean, if I said 20,<br>8   maybe 20.  I don't know.<br><br>113:10-14 [BOSTON SCIENTIFIC]<br>10    Q.    And I believe you said that Ms. Sanchez is<br>11   a unique case for your practice?<br>12    A.    Very unique.  Because my partner's doing<br>13   just as many, if not more cases, so we have a fair<br>14   amount of patients who are being treated.<br><br>114:2-115:19 [BOSTON SCIENTIFIC]<br>2    Q.    So in terms of the assessing the different<br>3   types of treatment options to provide to your patients,<br>4   you mentioned that, you know, you've clearly gone to<br>5   conferences; is that right?<br>6    A.    Correct.<br>7    Q.    So do you use conferences as a source of<br>8   information to inform you about treatment options<br>9   available to your patients?<br>10    A.    As well as paper literature and Internet<br>11   literature.<br>12    Q.    So paper literature, is that like medical | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 13  journals? | | |
| 14      A.    Correct. | | |
| 15      Q.    And Internet literature, is that also just | | |
| 16  electronic versions of the same? | | |
| 17      A.    Correct.  Electronic versions in | | |
| 18  different -- you know, you can find more studies and | | |
| 19  different things that maybe is not in one of your | | |
| 20  current journals. | | |
| 21      Q.    Okay.  Do you also rely on colleagues to | | |
| 22  provide you information about potential treatment | | |
| 23  options for your patients? | | |
| 24      A.    To a degree, not necessarily. | | |
| 25      Q.    Okay.  What other sources do you rely on | | |
| 115 | | |
| 1  with regard to identifying potential treatment options | | |
| 2  for your patients with SUI or POP? | | |
| 3      A.    I mean, we look at what ACOG is | | |
| 4  recommending and just sort of get the general sort of | | |
| 5  trends in the industry, and seeing what we think is | | |
| 6  worth looking into or what's risky and what's not risky. | | |
| 7  And then of course there are always the representatives | | |
| 8  who come to the office and many times they'll show | | |
| 9  something new and give you their paper literature and | | |
| 10  looking through that. | | |
| 11      Q.    So you have met with a Boston Scientific | | |
| 12  sales rep in the past; is that right? | | |
| 13      A.    A few. | | |
| 14      Q.    And they have provided you with literature | | |
| 15  regarding their products? | | |
| 16      A.    Absolutely. | | |
| 17      Q.    Do you rely on sales representatives in | | |
| 18  making medical decisions? | | |
| 19      A.    100 percent no. | | |
| | | |
| 115:22-24 [BOSTON SCIENTIFIC] | | |
| 22      Q.    Do you rely on sales representatives in | | |
| 23  making medical decisions about the safety of medical | | |
| 24  devices? | | |
| | | |
| 116:1 [BOSTON SCIENTIFIC] | | |
| 1          THE WITNESS:  No. | | |
| | | |
| 116:3-6 [BOSTON SCIENTIFIC] | | |
| 3      Q.    And am I correct that your interactions | | |
| 4  with sales reps that doesn't replace your own | | |
| 5  independent medical judgment, right? | | |
| 6      A.    Correct. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 116:11-117:6 [BOSTON SCIENTIFIC]<br>11      Q.    How about Pinnacle, do you have specific<br>12   recall about discussions you had with Boston Scientific<br>13   sales reps about the Pinnacle?<br>14      A.   Not specifically.<br>15      Q.    In terms of the materials that Boston<br>16   Scientific sales reps have provided you regarding<br>17   Pinnacle, do you have a specific recollection of the<br>18   material they provided you?<br>19      A.   Not specifically.<br>20      Q.    Is it your understanding that they provided<br>21   you with directions for use perhaps?<br>22      A.    Directions for use, studies, you know,<br>23   trying to show you the efficacy of why their product is<br>24   superior to what we were doing, how their mesh would be<br>25   different to what we're putting in.<br>                                                                                      117<br>1      Q.    But you don't have specific recall of the<br>2   materials they provided?<br>3      A.   Not specifically.<br>4      Q.    Do you remember the first time you saw a<br>5   directions for use with the Pinnacle?<br>6      A.   No.<br><br>117:11-13 [BOSTON SCIENTIFIC]<br>11      Q.    But you have read both of those; is that<br>12   right?<br>13      A.    At some point.<br><br>117:14-17 [BOSTON SCIENTIFIC]<br>14      Q.    Do you have specific recollection of an<br>15   instance of where a Boston Scientific sales<br>16   representative did not answer your questions about the<br>17   Pinnacle in a forthright and honest way?<br><br>117:19 [BOSTON SCIENTIFIC]<br>19           THE WITNESS:  No.<br><br>117:21-22 [BOSTON SCIENTIFIC]<br>21      Q.    And same question, how about the Advantage<br>22   Fit?<br>117:24 [BOSTON SCIENTIFIC]<br>24           THE WITNESS:  No.<br><br>118:2-12 [BOSTON SCIENTIFIC] | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 2    Q.    Other than sales representatives have you<br>3  had any other contact with Boston Scientific regarding<br>4  the Pinnacle or the Advantage?<br>5    A.    No.<br>6    Q.    Have you ever attended any Boston<br>7  Scientific training?<br>8    A.    No.<br>9    Q.    So any cadaver labs?<br>10    A.    Not from Boston Scientific.<br>11    Q.    How about from other manufacturers?<br>12    A.    Sure.<br><br>119:19-120:18 [BOSTON SCIENTIFIC]<br>19    Q.    And did you -- you felt that based on your<br>20  clinical experience -- well, prior to Ms. Sanchez'<br>21  surgery in 2010, based on your clinical experience you<br>22  felt that you had developed the adequate skill and<br>23  expertise required to perform the surgical techniques<br>24  for placement of the synthetic sling, right?<br>25    A.    Correct.<br>                                        120<br>1    Q.    And also, again, before Ms. Sanchez'<br>2  surgery, based on your clinical practice, you felt that<br>3  you developed the adequate skill and expertise required<br>4  to perform the surgical techniques involved with placing<br>5  mesh for POP; is that right?<br>6    A.    Correct.<br>7    Q.    And that's also true of the techniques<br>8  required for placing the Advantage Fit, you felt you had<br>9  the adequate skill and expertise to place that prior to<br>10  placing Ms. Sanchez'?<br>11    A.    Correct.<br>12    Q.    And you felt prior to placing her Pinnacle<br>13  that you had the adequate skill and expertise to place<br>14  that device as well?<br>15    A.    Correct.<br>16    Q.    And I'm also correct that you believe you<br>17  had the sufficient training and expertise to deal with<br>18  complications that might arise from those surgeries?<br>120:20 [BOSTON SCIENTIFIC]<br>20        THE WITNESS:  Correct.<br><br>120:23-121:14 [BOSTON SCIENTIFIC]<br>23        Other than your residency, have you ever<br>24  sat in with perhaps more experienced physicians with<br>25  regard to the placement of a Pinnacle prior to your<br>                                        121 | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 1   placing your own?<br>2       A.   No.  I mean, my -- I saw my partner do it,<br>3   but nothing, no.<br>4       Q.   How about the Advantage Fit, other than in<br>5   residency have you ever sat in with a more experienced<br>6   physician to watch the placement of Advantage Fit before<br>7   you did your own?<br>8       A.   No.<br>9       Q.   And that's because you had done those<br>10  procedures before?<br>11      A.   Correct.<br>12      Q.   Have you ever had any Pinnacle specific<br>13  training?<br>14      A.   No.<br>**121:17-21 [BOSTON SCIENTIFIC]**<br>17      Q.   Have you ever attended any training offered<br>18  by Boston Scientific with regards to the Pinnacle?<br>19      A.   No.<br>20      Q.   And did you have an understanding that that<br>21  type of training was available?<br><br>**121:23 - 122:1 [BOSTON SCIENTIFIC]**<br>23          THE WITNESS:  Probably.  We were doing the<br>24  procedure without Pinnacle, using different product, but<br>25  essentially doing the entire procedure well before<br>                                                         122<br>1   Pinnacle came out.<br><br>**122:3-12 [BOSTON SCIENTIFIC]**<br>3       Q.   When assessing treatment options for your<br>4   patients you considered the potential risks and benefits<br>5   associated with those treatment options, right?<br>6       A.   Correct.<br>7       Q.   Am I correct that you get, much like you<br>8   described before, that the information about treatment<br>9   options for your patients with SUI and POP, the<br>10  information you look to to identify those options, does<br>11  that information also pertain to the risks and benefits<br>12  of those treatment options?<br>**122:14 [BOSTON SCIENTIFIC]**<br>14          THE WITNESS:  Yes.<br><br>**122:16-25 [BOSTON SCIENTIFIC]**<br>16      Q.   And so am I correct that you looked to<br>17  medical literature to help you understand the risks and<br>18  benefits associated with treatment options for POP? | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

19      A.   Correct.
20      Q.   And that you also look to medical
21   literature to identify the risks and benefits associated
22   with the treatment options available for SUI?
23      A.   Correct.
24      Q.   Do you as part of your practice, do you
25   keep up with medical literature about SUI and POP?

123:1 [BOSTON SCIENTIFIC]
1      A.   I think so, yes.
123:5-10 [BOSTON SCIENTIFIC]
5      Q.   And do you read medical literature on a
6   regular basis?
7      A.   Regular basis.
8      Q.   Has that always been the case in your
9   practice?
10      A.   Yeah, it's important to stay current.

123:15-20 [BOSTON SCIENTIFIC]
15      Q.   And do you offer -- do you still use
16   synthetic slings for your patients today?
17      A.   For stress incontinence, yes.
18      Q.   Yes.  And so based on your clinical
19   experience do you believe that mesh slings are an
20   effective option for women as a treatment of SUI?

123:22 [BOSTON SCIENTIFIC]
22          THE WITNESS:  Yes.

123:24-25 [BOSTON SCIENTIFIC]
24      Q.   And do you also believe that synthetic
25   slings for the treatment of SUI are a safe option for
124:1 [BOSTON SCIENTIFIC]
1   women for the treatment of SUI?
124:3 [BOSTON SCIENTIFIC]
3          THE WITNESS:  Yes.
124:5-8 [BOSTON SCIENTIFIC]
5      Q.   Based on your clinical experience, do you
6   believe that mesh with the treatment of POP can be an
7   effective option for the treatment of POP in some
8   women?
124:10 [BOSTON SCIENTIFIC]
10          THE WITNESS:  Yes.

126:19-127:9 [BOSTON SCIENTIFIC]
19      Q.   Now, when you started using slings back in
20   the late 1990s did you have an understanding that there

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 21   were risks associated with using those devices?<br>22       A.   Yes.<br>23       Q.   And when you started using synthetic mesh<br>24   for POP, so when you --<br>25       A.   Right.<br><div align="center">127</div>1       Q.   Did you also understand there were risks<br>2   associated with that procedure?<br>3       A.   Yes.<br>4       Q.   So you understood that there are risks<br>5   associated with the use of the Advantage Fit?<br>6       A.   Yes.<br>7       Q.   And you also understood that there were<br>8   risks associated with the use of Pinnacle?<br>9       A.   Yes.<br><br>127:12-14 [BOSTON SCIENTIFIC]<br>12       Q.   And you became aware of the risks<br>13   associated with use of Pinnacle as early as 2004 when<br>14   you started using it; is that right?<br>127:16-17<br>16           THE WITNESS:  Well, there's inherent risk,<br>17   yes.<br><br>128:2-25 [BOSTON SCIENTIFIC] [Def. Ex. 7]<br>2       Q.   Have you seen this document before?<br>3       A.   Not that I recall.<br>4       Q.   Okay.  Do you know what it is?<br>5       A.   It looks like an instruction manual.<br>6       Q.   For what?<br>7       A.   For the Advantage Fit system.<br>8       Q.   And I believe you said earlier that you had<br>9   at some point, perhaps long ago, reviewed the DFU, the<br>10   directions for use for the Advantage Fit; is that<br>11   right?<br>12       A.   I'm assuming that when the representative<br>13   came with the paper literature that it was what -- I<br>14   looked at that, yes.<br>15       Q.   Would you have also looked at this type of<br>16   thing in the course of your residency?<br>17       A.   No.<br>18       Q.   Were you aware that the DFU accompanies the<br>19   actual device?<br>20       A.   I don't understand what you're asking, that<br>21   this comes specifically from the company?<br>22       Q.   No, no, no.  Are you aware that the<br>23   directions for use actually comes with the sling | | |

SECOND AMENDED NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 24  itself?<br>25      A.   I did not.<br><br>129:7-11 [BOSTON SCIENTIFIC]<br>7      Q.   Is it also your understanding that the<br>8   directions for use would also include information<br>9   regarding potential risks and benefits associated with<br>10   the device?<br>11      A.   It makes sense, yes.<br><br>129:17-23 [BOSTON SCIENTIFIC]<br>17      Q.   And in the course of the treatment options<br>18   that you offer to your patients you prescribe drugs,<br>19   right?<br>20      A.   Uh-huh, yes.<br>21      Q.   And you also prescribe potentially<br>22   implantable medical devices, right?<br>23      A.   Yes.<br><br>131:18-25 [BOSTON SCIENTIFIC]<br>18      Q.   It also says, "The physician's advised to<br>19   consult the medical literature regarding techniques,<br>20   complications and hazards associated with intended<br>21   procedures."  Did I read that correctly?<br>22      A.   Correct.<br>23      Q.   Am I right that you review medical<br>24   literature as a part of your practice, right?<br>25      A.   Yes.<br><br>137:11-16 [BOSTON SCIENTIFIC] [Def. Ex. 7]<br>11      Q.   You've got Exhibit 3 in front of you,<br>12   right?<br>13      A.   Got it.<br>14      Q.   So it's your understanding that you<br>15   reviewed this DFU in the past; is that right?<br>16      A.   At some point, yes.                    138<br>1   BY MS. WEILER:<br>2      Q.   And is it your understanding that it<br>3   provides you information regarding the procedures<br>4   involved with placement of the Pinnacle?<br>5      A.   Yes.<br>6      Q.   And is it also your understanding that this<br>7   directions for use contained information regarding the<br>8   potential risks and benefits associated with the<br>9   Pinnacle placement? | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 138:11-140:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 7] | | |

138:11-140:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 7]

11          THE WITNESS:  Yes.
12  BY MS. WEILER:
13      Q.   So if you can turn to Page 3 again, I'm
14  referring to the little numbers at the bottom of the
15  text.  At the top of the first column it begins again by
16  saying "Federal law restricts this device for sale by or
17  on the order of a physician."  Did I read that
18  correctly?
19      A.   Correct.
20      Q.   And so that means that the patient can't
21  get it without you ordering it for her, right?
22      A.   Right.
23      Q.   Okay.  So just underneath that it says,
24  "Training on the use of the Pinnacle pelvic floor kit is
25  recommended and available."  Did I read that correctly?
                                                    139
1      A.   Yes.
2      Q.   And so was it your understanding that
3  training was available for the Pinnacle placement?
4      A.   Yes.
5      Q.   Just after that it says, "Contact your
6  company sales representative to arrange for this
7  training.  Physicians should have experience in the
8  management of complications resulting from procedures
9  using surgical mesh."  Did I read that correctly?
10      A.   Correct.
11      Q.   And am I right that you had experience in
12  the management of complications resulting from
13  procedures using surgical mesh at the time you placed
14  Ms. Sanchez' device?
15      A.   Yes.
16      Q.   And was it also your understanding that you
17  could ask your Boston Scientific sales rep for training
18  regarding Pinnacle use if you so desired?
19      A.   Yes.
20      Q.   Now, just down below in that same column it
21  says, "Intended use indications for use."  Do you see
22  that?
23      A.   Uh-huh.
24      Q.   The text that's written there, is that the
25  indication for which you were treating Ms. Sanchez with
                                                    140
1  the Pinnacle?
2      A.   Yes.

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 3      Q.    And you thought that she was an appropriate<br>4   candidate for this device?<br>140:6<br>6             THE WITNESS:  Yes.<br><br>140:11-141:16 [BOSTON SCIENTIFIC] [Referencing Def.<br>Ex. 7]<br>11      Q.    It says, "The Pinnacle synthetic mesh is<br>12   contraindicated for use in any patient in whom soft<br>13   tissue implants are contraindicated.  In addition,<br>14   patients with:"  And below I'm looking at the sixth<br>15   bullet, it says, "Blood coagulation disorders."  Do I<br>16   see that?<br>17      A.    Yes.<br>18      Q.    I mean did I read that correctly?<br>19      A.    Yes.<br>20      Q.    Am I correct that the blood coagulation<br>21   disorder is like the factor V Leiden that we talked<br>22   about earlier?<br>23      A.    Yes.<br>24      Q.    And am I correct that you considered<br>25   Ms. Sanchez' factor V Leiden status at the time that you<br>                                                          141<br>1   prescribed the Pinnacle for her?<br>2      A.    Yes.<br>3      Q.    And that despite that condition you still<br>4   felt that it was a safe device for implantation in<br>5   her?<br>6      A.    Yes.<br>7      Q.    And you still felt she was an appropriate<br>8   candidate for the Pinnacle?<br>9      A.    Yes.<br>10      Q.    We also talked about her history of DVTs.<br>11   Do you recall that discussion?<br>12      A.    Uh-huh.<br>13      Q.    Is that yes?<br>14      A.    Yes.<br>15      Q.    Does a DVT fall under blood coagulation<br>16   disorder or is that something separate?<br><br>141:18-142:14 [BOSTON SCIENTIFIC] [Referencing Def.<br>Ex. 7]<br>18             THE WITNESS:  It's something separate.<br>19   BY MS. WEILER:<br>20      Q.    If you could turn to Page 4, first column<br>21   under warning/potential complications.  Do you see<br>22   that? |  |  |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 23    A.   Yes.<br>24    Q.   I'm looking at the seventh bullet down, it<br>25  starts with "In the event that infection presents<br><div align="right">142</div>1  post-procedure, the entire mesh may have to be removed<br>2  or revised."<br>3    A.   Yes.<br>4    Q.   Did you talk to Ms. Sanchez about the<br>5  possibility that her mesh could be removed?<br>6     A.   I never discussed with her having the<br>7  entire mesh, it was my understanding, still is, that<br>8  it's not easy to take -- it's not like something that<br>9  easily slides out.  It's an involved procedure that is<br>10  not usually successful.<br>11    Q.   And did you -- but did you talk to her<br>12  about the possibility that she might have to have<br>13  portions of her mesh removed?<br>14    A.   Yes.<br><br>143:8-16 [BOSTON SCIENTIFIC]<br>8    Q.   Okay.  So let me clarify then.  Prior to<br>9  placing Ms. Sanchez' mesh did you talk to her about the<br>10  risk of erosion?<br>11    A.   So I talked about different complications<br>12  from the mesh, and erosion always comes up in that<br>13  conversation.<br>14    Q.   Okay.  And so is erosion something that you<br>15  always talk about to your patients who are contemplating<br>16  the placement of mesh for the treatment of SUI?<br>143:18<br>18       THE WITNESS:  For synthetic mesh, yes.<br><br>144:3-9 [BOSTON SCIENTIFIC]<br>3    Q.   So then let's talk about synthetic mesh for<br>4  the treatment of POP.  When you were still placing that<br>5  type of mesh, did you talk to your patients about the<br>6  potential risk of erosion associated with the placement<br>7  of synthetic mesh for the treatment of POP?<br>. . .<br>9    A. Yes.<br><br>144:11-12 [BOSTON SCIENTIFIC]<br>11    Q.   Did it include Ms. Sanchez?<br>12    A.   Yes.<br><br>145:19-146:20 [BOSTON SCIENTIFIC] [Referencing Def. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| | TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|---|
| 1 | Ex. 7] | | |
| 2 | 19     Q.    It says, "Tissue responses to the implant<br>20   could include local irritation at the wound site, | | |
| 3 | 21   vaginal erosion or exposure through the urethra or other | | |
| 4 | 22   surrounding tissue, migration of the device from the<br>23   desired location, fistula formation, foreign body | | |
| 5 | 24   reaction and inflammation.  The occurrence of these<br>25   responses may require removal or revision of the | | |
| 6 | mesh." | | |
| | | 146 | |
| 7 | 1   Did I read that correctly? | | |
| 8 | 2     A.   Correct. | | |
| 9 | 3     Q.    At the time of placing Ms. Sanchez'<br>4   Pinnacle were you aware of these potential<br>5   complications? | | |
| 10 | 6     A.   Yes. | | |
| 11 | 7     Q.    Including you were also aware that she<br>8   might have to have removal or revision of her Pinnacle | | |
| 12 | 9   mesh; is that right?<br>10     A.   Yes. | | |
| 13 | 11     Q.    Is that something you communicated to<br>12   her? | | |
| 14 | 13     A.    I'm assuming.  I mean, I spoke about the<br>14   complications, I spoke about erosion and things like | | |
| 15 | 15   that.  I know I did not discuss with patients about | | |
| 16 | 16   having their mesh removed in part or in total because I<br>17   did not believe that that was something that could be | | |
| 17 | 18   performed, but they knew that this was a permanent<br>19   structure that was staying with them.  They understood | | |
| 18 | 20   that.  We discussed permanence. | | |
| 19 | 147:21-22 [BOSTON SCIENTIFIC] | | |
| 20 | 21     Q.    But you talked to them about erosion?<br>22     A.   Correct. | | |
| 21 | | | |
| 22 | 148:6-25 [BOSTON SCIENTIFIC] [Referencing Def. Ex.<br>7] | | |
| 23 | 6     Q.    So erosion and exposure to you are the same<br>7   thing? | | |
| 24 | 8     A.   Yes. | | |
| 25 | 9     Q.    Okay.  But that was something that you<br>10   talked about with your patients prior to implantation of<br>11   synthetic mesh for POP? | | |
| 26 | 12     A.   Correct. | | |
| 27 | 13     Q.    And you also talked to Ms. Sanchez about<br>14   that? | | |
| 28 | 15     A.   Correct. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 16     Q.   Okay.  Three bullets down from that says, 17  "Known risks of surgical procedures for the treatment of 18   prolapse include pain, infection, erosion/exposure, 19   device migration, complete failure of the procedure 20   resulting in recurrent or de Novo prolapse and/or 21   incontinence."  Did I read that correctly? 22     A.   Correct. 23     Q.   Were you aware of these potential 24   complications associated with the placement of Pinnacle 25   for the treatment of POP?<br><br>149:2 [BOSTON SCIENTIFIC] 2         THE WITNESS:  Yes.<br><br>149:4-6 [BOSTON SCIENTIFIC] 4     Q.   And you knew that before you placed 5   Ms. Sanchez'? 6     A.   Yes. 149:9-10 [BOSTON SCIENTIFIC] 9     Q.   And did you talk with her about those 10   potential complications? 149:12 [BOSTON SCIENTIFIC] 12         THE WITNESS:  Yes. 149:14-150:4 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 7] 14     Q.   Down below under Precaution it says, 15   "Surgical treatment of female pelvic organ prolapse 16   should be performed by clinicians with adequate training 17   and experience."  Did I read that correctly? 18     A.   Yes. 19     Q.   And am I correct that you felt you had the 20   adequate training and experience to place the Pinnacle 21   prior to placing it in Ms. Sanchez? 22     A.   Yes. 23     Q.   Down the next column it says, "Adverse 24   events."  Do you see that? 25     A.   Yes. |  |  |
| 150 1     Q.   And it was your understanding prior to 2   placing Ms. Sanchez' Pinnacle that there were potential 3   complications associated with the placement of that 4   device, right?<br><br>150:6 [BOSTON SCIENTIFIC] |  |  |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 6        THE WITNESS:  Yes.<br>150:8-12 [BOSTON SCIENTIFIC]<br>8     Q.   You were aware of potential risk of<br>9  adhesion formation associated with that device?<br>10     A.   Yes.<br>11     Q.   Were you also aware of the potential<br>12  complication of bruising, hematoma and hemorrhage?<br>150:14-151:4 [BOSTON SCIENTIFIC]<br>14  not a potential complication.<br>15        THE WITNESS:  It's an adverse event, yes.<br>16  Adverse.<br>17  BY MR. MORELAND:<br>18     Q.   Let me reask my question.  Were you aware<br>19  of the possibility of a patient having adhesion<br>20  formation following the implantation of Pinnacle?<br>21     A.   Yeah.<br>22     Q.   Were you aware of the possibility of a<br>23  patient having bruising, hematoma or hemorrhage<br>24  following the implantation of Pinnacle?<br>25     A.   Yes.<br>                                                         151<br>1     Q.   Were you aware of the possibility of a<br>2  patient to experiencing dyspareunia following<br>3  implantation of the Pinnacle?<br>4     A.   Yes.<br><br>151:7-8 [BOSTON SCIENTIFIC]<br>7     Q.   Were you aware of that prior to placing<br>8  Ms. Sanchez'?<br><br>151:10-152:4 [BOSTON SCIENTIFIC]<br>10        THE WITNESS:  Yes.<br>11  BY MS. WEILER:<br>12     Q.   And prior to placing Ms. Sanchez' Pinnacle<br>13  were you aware of the possibility of erosion or<br>14  extrusion occurring?<br>15     A.   Yes.<br>16     Q.   And prior to placing Ms. Sanchez' Pinnacle<br>17  were you aware of the possibility of pain, discomfort or<br>18  irritation occurring after that implant?<br>19     A.   Yes.<br>20     Q.   And were you aware of the possibility that<br>21  pain might occur following the implantation of a<br>22  Pinnacle -- strike that.<br>23        Were you also aware of the possibility of<br>24  recurrent prolapse occurring after placement of a<br>25  Pinnacle? | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 152 | | |

1    A.    Yes.
2    Q.    And were you aware prior to placing
3    Ms. Sanchez' Pinnacle that erosion or extrusion might be
4    associated with the Pinnacle?

152:6-10 [BOSTON SCIENTIFIC]
6            THE WITNESS:  Yes.
7    BY MS. WEILER:
8    Q.    Were you aware prior to placing
9    Ms. Sanchez' POP Pinnacle that pain might be associated
10   with the Pinnacle?
152:12 [BOSTON SCIENTIFIC]
12           THE WITNESS:  Yes.

156:9-15 [BOSTON SCIENTIFIC]
9    Q.    Now, you mentioned that you are a member of
10   ACOG, right?
11   A.    Correct.
12   Q.    And is that -- what is ACOG?
13   A.    It's the American College of Obstetrics and
14   Gynecology.  It's sort of the guidelines for board
15   certified physicians.

156:22-23 [BOSTON SCIENTIFIC]
22   Q.    Is it a profession organization?
23   A.    It's a professional organization.
157:4-24 [BOSTON SCIENTIFIC]
4    Q.    And am I correct that you have -- you rely
5    on ACOG for one as a source of information about
6    potential treatment options that you offer to your
7    patients?
8    A.    One of the sources.
9    Q.    And you also -- have you also relied on
10   information from ACOG with regard to potential risks
11   associated with those treatment options?
12   A.    Yes.
13   Q.    You mentioned that you have in the past
14   referred some of your patients to urogynecologists; is
15   that right?
16   A.    Correct.
17   Q.    Why is that?

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 18     A.    Because I know the scope, the limits of my 19   practice and knowledge base and talent. 20       Q.    And are urogynecologist specialists -- 21       A.    Yes. 22       Q.    -- in the field of pelvic organ prolapse 23   repair? 24       A.    Yes.<br><br>158:13-17 [BOSTON SCIENTIFIC] [Def. Ex. 55] 13       Q.    I'll mark as Exhibit 13  and hand it to you. 14             MR. MORELAND:  Which one is it? 15             MS. WEILER:  It's the Position Statement on 16   Restriction of Surgical Options for Pelvic Floor 17   Disorders.  I'm sure you're familiar with it.<br><br>159:8-160:6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55] 8       Q.    So is this -- correct me if I'm wrong.  Is 9   this a position statement put out by the American 10   Urogynecologic Society regarding the use of -- or 11   surgical options for the treatment of pelvic floor 12   disorders? 13       A.    Correct. 14       Q.    And so this a physician statement that 15   they're issuing in connection with urogynecologists, 16   right? 17       A.    Correct. 18       Q.    So if I could direct your attention to the 19   first bolded paragraph on that first page, it says, "The 20   American Urogynecologic Society strongly opposes any 21   restrictions by state or local medical organizations, 22   healthcare systems, or insurance companies which ban 23   currently available surgical options performed by 24   qualified and credentialed surgeons on appropriately 25   informed patients with pelvic floor disorders."  Did I<br>                                                             160 1   read that correctly? 2       A.    Correct.  There's no date on this, when is 3   this? 4       Q.    It's March 26, 2013. 5       A.    Okay. 6       Q.    Do you agree with that statement?<br><br>160:8-9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55] 8             THE WITNESS:  It says they're opposing any | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 9   restrictions?  Yeah, I guess.<br><br>160:14-161:1 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>14      Q.    The bold is "The decision on surgical<br>15   alternatives should be made by the patient and her<br>16   surgeon."  The very bottom of that page it says, "No one<br>17   approach has proven to be superior in all cases and it<br>18   is particularly essential that specialists who regularly<br>19   treat advanced and/or recurrent prolapse are able to<br>20   maintain a complete set of treatment options in order to<br>21   provide the most effective individualized care."  Did I<br>22   read that correctly?<br>23      A.   Yes.<br>24      Q.   Is it important to you to have treatment<br>25   options for your patients?<br>161<br>1      A.   Yes.<br><br><br><br>161:4-13 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>4      Q.   And would you agree with the statement I<br>5   just read before?<br>6      A.   Yes.<br>7      Q.   Now, I'm on Page 2 about two sentences<br>8   after the one I just read, it says, "A ban on the use of<br>9   synthetic mesh materials would potentially prohibit many<br>10   women from accessing the full range of treatment options<br>11   available."  Did I read that correctly?<br>12      A.   Correct.<br>13      Q.   Do you agree with that statement?<br><br>161:15 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>15         THE WITNESS:  Yes.<br>161:17-22 [BOSTON SCIENTIFIC]<br>17      Q.   If you could turn to Page 3, the top of the<br>18   page in bold, No. 4, it says, "In some circumstances<br>19   transvaginal mesh for pelvic organ prolapse may be the<br>20   most appropriate surgical option."<br>21      A.   Yes.<br>22      Q.   Do you agree with that statement? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 161:24 [BOSTON SCIENTIFIC]<br>24        THE WITNESS:  Yes.<br><br>162:2-9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>2      Q.   Down below in the paragraph that follows<br>3   that it says, very last sentence, "A review of more<br>4   current studies from 2011 and 2012 suggest that<br>5   transvaginal mesh placed by experienced mesh surgeons<br>6   may have mesh erosion rates comparable to abdominally<br>7   placed mesh."  Did I read that correctly?<br>8      A.   Correct.<br>9      Q.   Do you agree with that statement?<br>162:11 [BOSTON SCIENTIFIC]<br>11        THE WITNESS:  Correct.<br>162:13-18 [BOSTON SCIENTIFIC]<br>13      Q.    Just underneath that it says, "There are<br>14   certain clinical situations where many would agree the<br>15   use of transvaginal mesh is not only acceptable but<br>16   preferred."  Did I read that correctly?<br>17      A.   Yes.<br>18      Q.    Do you agree with that statement?<br>162:20 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>20        THE WITNESS:  Yes.<br>162:22-163:6 [BOSTON SCIENTIFIC]<br>22      Q.    At the bottom of that paragraph it says,<br>23   "It is our strong opinion, that there are subsets of<br>24   women with prolapse, and in some cases those with most<br>25   advanced disease, in whom the benefits of transvaginal<br><br>163:1-6 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 55]<br>1   mesh outweigh the risks and a blanket ban on the use of<br>2   these products compromises patient care."  Did I read<br>3   that correctly?<br>4      A.   Yes.<br>5      Q.   Would you agree with that statement?<br>6      A.   Yes.<br><br>164:8-165:11 [BOSTON SCIENTIFIC] [Def. Ex. 15]<br>8      Q.   I'd like to pass you what's been marked<br>9   Exhibit 14.  If you could take a look at that and let me<br>10   know have you seen that before?<br>11      A.   Yes, this is my office consent form.<br>12      Q.    So is that a consent form that you would<br>13   have discussed with Ms. Sanchez prior to her | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 14   implantation surgery? | | |
| 15      A.   Yes. | | |
| 16      Q.   And can you explain the process that you go | | |
| 17   through involving this consent form? | | |
| 18      A.   Sure.  This is a generic consent form. | | |
| 19   Essentially in the office I will speak to the patient | | |
| 20   directly and we'll go over what I think are the risks | | |
| 21   and benefits of the procedure, then she sees my surgery | | |
| 22   scheduler who has written this, and this is not my | | |
| 23   handwriting, this is what I've written on the orders to | | |
| 24   have surgery. | | |
| 25      Q.   So you're talking about the handwriting | | |
|                                                          165 | | |
| 1   mid-page here? | | |
| 2      A.   Correct.  And then she has the patient read | | |
| 3   this thoroughly and have them initial when they read it, | | |
| 4   but this is more of a generic hysterectomy type of | | |
| 5   consent. | | |
| 6      Q.   Okay.  So this consent is used with your | | |
| 7   surgery scheduler after you've already talked with the | | |
| 8   patient? | | |
| 9      A.   After a verbal. | | |
| 10      Q.   That's what occurred with Ms. Sanchez? | | |
| 11      A.   Correct. | | |
| | | |
| 165:13-166:9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] | | |
| 13   Ms. Sanchez was to read this entire form? | | |
| 14      A.   Correct. | | |
| 15      Q.   And she was to initial each paragraph? | | |
| 16      A.   Correct. | | |
| 17      Q.   And is it your understanding that RS all | | |
| 18   the way down the first page and on the second page, that | | |
| 19   those are her initials? | | |
| 20      A.   Correct. | | |
| 21      Q.   And is it your understanding that's her | | |
| 22   signature on the second page of this document too? | | |
| 23      A.   Correct. | | |
| 24      Q.   So would the discussion that you had with | | |
| 25   her prior to her seeing this form have included all the | | |
|                                                          166 | | |
| 1   risks that are listed in this paragraph on the first | | |
| 2   page second from the bottom that starts with "I have | | |
| 3   been told that this procedure may subject me to a | | |
| 4   variety of discomforts and risks"? | | |
| 5      A.   Correct. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 6     Q.    So everything contained in that full 7 paragraph was something you would have talked with 8 Ms. Sanchez about prior to her undergoing the surgery in 9 January 2010? <br><br> 166:11-167:2 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] <br> 11          THE WITNESS:  Correct.  The other consent 12 is that after all of this when she's admitted the day of 13 surgery they look at my orders and write down on their 14 generic consent and make her read their generic 15 consent. <br> 16 BY MS. WEILER: <br> 17     Q.    So in that same paragraph that I was just 18 referring to it says, last sentence, "Finally, it must 19 be understood that it is impossible to list every 20 possible undesirable effect and that the condition for 21 which surgery is done is not always cured or 22 significantly improved and in rare cases may be even 23 worse."  Did I read that correctly? <br> 24     A.    Correct. <br> 25     Q.    Is that something that you would discuss <br><div align="right">167</div> 1 with Ms. Sanchez? <br> 2     A.    Yes. <br><br> 167:5-169:8 [BOSTON SCIENTIFIC] <br> 5     Q.    And it was your understanding that after 6 your discussion with her and her having signed this 7 consent she was willing to undergo the procedures that 8 you were going to perform in January 2010? <br> 9     A.    Correct. <br> 10     Q.    When you talked to Ms. Sanchez about the 11 risks, potential risks and benefits associated with the 12 placement of the Pinnacle and the Advantage Fit, did you 13 describe the procedures to her? <br> 14     A.    Yes. <br> 15     Q.    How did you describe them to her? <br> 16     A.    So I speak more in laymen's terms and I 17 discuss the vagina being like a room and how we're going 18 to lift the roof up and put a piece of mesh between the 19 roof and the -- what's above it, sort of in the attic 20 area.  Same with the floor, and that way you tack up the 21 walls of the -- the corners of the room and tack things | | |

<div align="center">74</div>

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 22  up.  So I explain it like that in very sort of easier<br>23  terms to understand.<br>24      Q.    Do you ever show any of your patients a<br>25  piece of the mesh you're going to implant?<br>                                              168<br>1      A.    I haven't.<br>2      Q.    Do you use any sort of models or pictures<br>3  or anything to help with your discussion?<br>4      A.    We do use some pictures, just some -- we<br>5  have a -- I think it's from ACOG, a book of just generic<br>6  anatomy to sort of show patients, but I tend to use my<br>7  hands, gesture.<br>8      Q.    Would you have used some of those pictures<br>9  with Ms. Sanchez?<br>10      A.    Probably.<br>11      Q.    And did you specifically talk about the<br>12  actual products you were going to be implanting in<br>13  Ms. Sanchez with her?<br>14      A.    I did.<br>15      Q.    Did you talk to her about the Advantage Fit<br>16  in particular?<br>17      A.    I did.<br>18      Q.    And what did you say to her?<br>19      A.    So I tell patients that it's a<br>20  polypropylene mesh and that polypropylene has been used<br>21  for many different purposes, hernias and things like<br>22  that over time, and that I've used it for many, many<br>23  years and have had good success with it, and just<br>24  explained that it's, you know, a product that's been<br>25  tried and tested and what I thought to be safe.<br>                                              169<br>1      Q.    And did you also talk with her specifically<br>2  about the Pinnacle?<br>3      A.    Same thing, yes.<br>4      Q.    So you related the same kind of details as<br>5  you did about the Fit about the Pinnacle to her?<br>6      A.    Yes.  Correct.  And reassured her that<br>7  these are procedures we would do even without mesh, you<br>8  know, it's not -- we weren't inventing the wheel.<br><br>169:11-12 [BOSTON SCIENTIFIC]<br>11              When you talked to her about erosion, what<br>12  did you tell Ms. Sanchez?<br><br>169:14-23 [BOSTON SCIENTIFIC] | | |

SECOND AMENDED NOTICE OF DESIGNATED DEPOSITION TESTIMONY OF KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|

14          THE WITNESS:  That sometimes with our
15  literature, as well as with our experience, that some
16  people have where the mesh is exposed, mesh erosion.
17  I've never had a case where it erodes up into the
18  urethra or the bladder, things that I know of.  And that
19  a lot of it has to do with placement and how it is
20  placed.  But that we have seen it erode into the vaginal
21  mucosa and when that happens it's usually a quick simple
22  little procedure in the office and there's ways to
23  handle it.


169:25-170:4 [BOSTON SCIENTIFIC]
25      Q.    And that is in part based on what you've
170
1  seen in the literature and clinical practice?
2      A.    Yes.
3      Q.    And when you talked to her about the
4  dyspareunia what did you tell her?


170:6-15 [BOSTON SCIENTIFIC]
6          THE WITNESS:  That, again, it has to do
7  with the placement of the mesh and the way the surgery,
8  and that in our history and anecdotally in our office
9  that if it's placed appropriately most of the time it's
10  not necessarily a common occurrence but, you know, if it
11  is -- if using different meshes and different product
12  you can have shortening or you can have where the vagina
13  cylindrically can become tighter and that can cause
14  problems, and I would do my best to not have that
15  occur.


171:24-172:2 [BOSTON SCIENTIFIC] [Def. Ex. 15]
24      Q.    Mark as Exhibit 16 another two-page
25  document Bates SanchezR Plaintiff 121 and 122.  Take a
172
1  quick look, let me know when you've had a chance to do
2  so, I'd appreciate it.


172:7-174:9 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15]
7      Q.    Have you seen this document before?
8      A.    Yes, this is my H&P.
9      Q.    So this is something you created?

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 10      A.    Correct. | | |
| 11      Q.    And is this a requirement that you have to | | |
| 12  do before surgery? | | |
| 13      A.    Correct. | | |
| 14      Q.    In the first paragraph it says HPI, it | | |
| 15  says -- second sentence from the bottom -- or third, | | |
| 16  "She uses tubal ligation as her mode of contraception | | |
| 17  and she desires definitive therapy."  Did I read that | | |
| 18  correctly? | | |
| 19      A.    Correct. | | |
| 20      Q.    What did you mean by "definitive therapy"? | | |
| 21      A.    For her bleeding, for her -- so since she's | | |
| 22  not interested in future futility she didn't have any | | |
| 23  reluctance to having her uterus removed. | | |
| 24      Q.    Was she having bleeding at that time? | | |
| 25      A.    She all along in our chart was talking | | |
|                                                                        173 | | |
| 1  about irregular bleeding and bleeding issues.  That | | |
| 2  wasn't the main focus of this surgery except that to | | |
| 3  improve her symptomatic prolapse, if you remove the | | |
| 4  uterus it's helpful. | | |
| 5      Q.    And it would also help with the bleeding | | |
| 6  that she was experiencing? | | |
| 7      A.    Exactly.  Double fold. | | |
| 8      Q.    And am I also correct that at the time of | | |
| 9  this record Ms. Sanchez of having loss of urine with | | |
| 10  coughing, sneezing and movement, right? | | |
| 11      A.    Correct. | | |
| 12      Q.    And that she was wearing a panty liner | | |
| 13  every day? | | |
| 14      A.    Correct. | | |
| 15      Q.    And am I also correct she was also | | |
| 16  urinating with intercourse? | | |
| 17      A.    Correct. | | |
| 18      Q.    And that she thought that was very | | |
| 19  embarrassing; is that right? | | |
| 20      A.    Correct. | | |
| 21      Q.    It also says that she was experiencing | | |
| 22  occasional fullness and pressure vaginally; is that | | |
| 23  right? | | |
| 24      A.    Yes. | | |
| 25      Q.    It says, "Her husband states he hit | | |
|                                                                        174 | | |
| 1  something when they have intercourse."  Did I read that | | |
| 2  correctly? | | |
| 3      A.    Yes. | | |
| 4      Q.    Do you recall her telling you about that? | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 5     A.   Yeah.  I mean, specifically, not<br>6  necessarily.  I shouldn't say yeah.<br>7     Q.   Do you remember --<br>8     A.   I just remember it was a problem,<br>9  intercourse was a problem.<br><br>174:19-21 [BOSTON SCIENTIFIC]<br>19     Q.   So at some point she conveyed to you that<br>20  they were having some difficulty with intercourse prior<br>21  to January 2010?<br>174:23<br>23          THE WITNESS:  Because of the prolapse.<br><br>174:25-175:2 [PLAINTIFFS COMPLETENESS<br>DESIGNATION]<br>*25     Q.   Okay.  Did she tell you whether she was*<br>*175*<br>*1  having pain with intercourse prior to that implant?*<br>*2     A.   I don't have that written down.*<br><br>175:18-20 [BOSTON SCIENTIFIC]<br>18     Q.   Am I correct that you performed the<br>19  cystectomy on Ms. Sanchez in 2003, right?<br>20     A.   2004, correct.<br><br>176:2-6 [BOSTON SCIENTIFIC] [Referencing Def. Ex.<br>15]<br>2     Q.   And this is the operative report for that<br>3  surgery.<br>4          MR. MORELAND:  What's the date?<br>5          MS. WEILER:  12/29/03.<br>6          THE WITNESS:  So yes, that was me.<br><br>176:11-177:3 [BOSTON SCIENTIFIC] [Referencing Def.<br>Ex. 15]<br>11     Q.   So that 2003 surgery that you performed,<br>12  you've got the op report in front of you still?<br>13     A.   Yes.<br>14     Q.   Turn to the second page of that in the<br>15  first large full paragraph beginning with a third skin<br>16  incision.<br>17     A.   Correct.<br>18     Q.   It says, the second sentence, "Using a<br>19  blunt probe the adhesions in the posterior cul de sac<br>20  were easily broken up."  Did I read that correctly?<br>21     A.   Yes.<br>22     Q.   What adhesions were you referring to? |  |  |

SECOND AMENDED NOTICE OF<br>DESIGNATED DEPOSITION TESTIMONY OF<br>KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 23    A.    So many times when a patient has had 24   surgery or an infection or other things you can have 25   adhesions where -- this is talking about the                177 1   posterior cul de sac, it would be the bowel or feeling 2   adhesions, your ovaries, things that are sort of down in 3   the pelvis can just stick.<br><br>187:22-188:8 [BOSTON SCIENTIFIC] [Referencing Def. Ex. 15] 22    Q.    So is this your H&P for that October 12th, 23   2010 procedure? 24    A.    Yes. 25    Q.    So --                188 1    A.    Gynecology history. 2    Q.    Yeah.  What is human papillomavirus? 3    A.    It's a virus that can cause abnormalities 4   in PAP smears and can cause genital warts and some other 5   things we don't quite know yet. 6    Q.    And she had had a history of that? 7    A.    She had a history of abdominal PAP smears 8   more than ten years ago, if I remember.<br><br>218:15-17 [BOSTON SCIENTIFIC] 15    Q.    Okay.  Is there any question in your mind 16   as Ms. Sanchez' physician that she is experiencing pain 17   as a result of her mesh?<br><br>218:20-21 [BOSTON SCIENTIFIC] 20           THE WITNESS:  She has occasional 21   discomfort, yeah.<br><br><br><br><br><br><br><br><br><br>199:14-16 [BOSTON SCIENTIFIC] 14    Q.    Counsel said earlier today that you had met 15   him before; is that right? | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 16     A.   Correct.<br><br>200:1-19 [BOSTON SCIENTIFIC]<br>1     Q.   And how long did you meet with him?<br>2     A.   Maybe an hour.<br>3     Q.   And what did you discuss?<br>4     A.   Just what would be going on today.<br>5     Q.   And so what did that entail?<br>6     A.   It just entailed he asked me about myself<br>7   and asked me about -- just getting a sense of my<br>8   practice and who I was, what kind physician I was, and<br>9   then specifically telling me what is happening with this<br>10   case and how I was not necessarily being sued, it was --<br>11   I'm sort of a bystander on all of this.<br>12     Q.   And what did he tell you in particular with<br>13   regard to what's happening with this case?<br>14     A.   He explained that, you know, many cases are<br>15   in discovery like this, and this case may go to a trial<br>16   and that there were some issues with some of the<br>product<br>17   and that was something that would be brought up today,<br>18   but it wouldn't be something -- I didn't -- we didn't<br>19   look into the specifics of stuff like that.<br><br>201:4-14 [BOSTON SCIENTIFIC]<br>4     Q.   When you talked with Mr. Moreland on that<br>5   occasion approximately two weeks ago, did he talk to<br>you<br>6   about potential areas of topics of testimony that we'd<br>7   be talking about today?<br>8     A.   Just areas of concern about the case.<br>9     Q.   For instance?<br>10     A.   You know, because I was wondering is it<br>11   operator error, is it a problem with the mesh, and so he<br>12   said, you know, one thing is the mesh in general and<br>13   just the procedure and the case and the patient, just<br>14   all of it sort of together.<br><br>201:24-25 [BOSTON SCIENTIFIC]<br>24     Q.   Did you talk about anything with regard to<br>25   the risks associated with Pinnacle or the Advantage Fit?<br><br>202:2-4 [BOSTON SCIENTIFIC]<br>2     THE WITNESS:   Alluded to the fact that<br>3   there may be some information bought up today, but did<br>4   not tell me anything specific.<br>202:6-13 [BOSTON SCIENTIFIC] | | |

| TESTIMONY | OBJECTION | RESPONSE |
|---|---|---|
| 6      Q.   And after that meeting did you meet with 7  Mr. Moreland again on another occasion? 8      A.   Last night. 9      Q.   For how long? 10      A.   For I think less than an hour. 11      Q.   What was the nature of your meeting last 12  night? 13      A.   Same thing. | | |

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

All signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Dated: May 4, 2015                         SHOOK HARDY & BACON L.L.P.

By:_____/s/ *Eva M. Weiler*_____
Eva M. Weiler

Attorneys for Defendant Boston Scientific Corporation

Dated: May 4, 2015                         KIESEL LAW L.L.P.

By:_____/s/ *Helen Zukin*_____.
Helen Zukin

Clayton A. Clark
(admitted *pro hac*)
cclark@triallawfirm.com
Scott A. Love
(admitted *pro hac*)
slove@triallawfirm.com
CLARK, LOVE & HUTSON, G.P.
440 Louisiana, Ste 1600
Houston, Texas 77002
Tel:  (713) 757-1400
Fax: (713) 759-1217

Jim Perdue
(admitted *pro hac vice*)
Perdue & Kidd, LLP
510 Bering Drive, Suite 550
Houston, TX  77057
Tel:  713-520-2500
Fax: 713-520-2525

Attorneys for Plaintiffs

82                           SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 4, 2015.


DATED: May 4, 2015                    Respectfully Submitted,

                                      KIESEL LAW LLP


                                      By: _____ /s/ *Helen Zukin* _____
                                           Helen Zukin
                                            *zukin@kiesel-law.com*
                                           8648 Wilshire Boulevard
                                           Beverly Hills, California  90211
                                           Tel.: (310) 854-4444
                                           Fax: (310) 854-0812

SECOND AMENDED NOTICE OF
DESIGNATED DEPOSITION TESTIMONY OF
KERRI WILTCHIK, M.D.